John WOODS and Beverly Woods,
Plaintiffs–Appellees,

and

Cooper/T. Smith Stevedores,
Intervenor–Appellee,

v.

SAMMISA COMPANY, LTD., et
al., Defendants.

SAMMILINE COMPANY, LTD., and
Hightworth Shipping Ltd., Defendants–
Third Party Plaintiffs–Appellants,
Cross–Appellees,

v.

PIONEER NAVIGATION, LTD., Defen-
dant–Third Party Defendant–Appellee,
Cross–Appellant.

No. 88–3113.

United States Court of Appeals,
Fifth Circuit.

May 30, 1989.
Rehearing and Rehearing En Banc
Denied June 30, 1989.

Robert H. Murphy, John H. Clegg, Dana H. Beer, Kenneth J. Servay, New Orleans, for Sammline Co., Ltd., et al.

Eldon E. Fallon, Stevan C. Dittman, New Orleans, La., for Woods.

Kevin J. LaVie, Andrew Martinez, New Orleans, La., for Pioneer Navigation.

John L. Duvieilh, Edward J. Koehl, Jr., New Orleans, La., for intervenor-Cooper/T. Smith.

Before GEE, SMITH and DUHE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, our primary task is to determine when, and to what extent, the defendants in this action—a vessel owner/operator and a time charterer—are liable for injuries suffered by a longshoreman while discharging cargo from the vessel. After a trial on the merits, the jury found, using the principles enunciated in *Scindia Steam Navigation Co. v. De los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), that both defendants, as well as the stevedore, the longshoreman's employer, were responsible for the longshoreman's injuries. The district court apportioned liability between the owner/operator and the

time charterer according to the respective percentages of fault assigned to each by the jury. Both defendants appeal on numerous grounds. Because we conclude that two out of the three theories of liability on which the jury was charged should not have been presented to the jury, we vacate the judgment and remand for a new trial.

### I.

### A.

Plaintiff John Woods was a longshoreman employed by Cooper/T. Smith Stevedores ("Cooper/T. Smith" or the "stevedore") in New Orleans. In 1984, he was part of a crew of longshoremen assigned to discharge a quantity of steel pipe located in the hold of the M/V SAMMI HERALD. The hold contained two rows, running fore and aft along its length, of loosely-bundled steel pipe, stowed pipe-to-pipe with little dunnage. In the forward half of the hold was steel pipe bound for Houston (the "Houston pipe"); the aft half contained the pipe which Woods's crew was directed to discharge (the "New Orleans pipe"). The Houston pipe was stacked considerably higher than the New Orleans pipe.

When the longshoremen looked into the hold before beginning discharge operations, they immediately noticed that, to varying degrees, the aft ends of some of the Houston pipe overlapped the forward ends of the New Orleans pipe. All parties agree that the overlapping condition of the cargo was created by the stevedore that loaded the pipe in Brazil. Testimony at trial indicated that, although the overlapping condition of the cargo was not unprecedented, the more common method of stowing steel pipe was to leave an "alleyway" between the two sets of pipe such that either set of pipe could be lifted vertically without coming into contact with the other.

The longshoremen agreed among themselves that it was a "bad stow," and the crew's superintendent told members of the ship's crew that the discharge would have to proceed very slowly because of the cargo's condition. The crew, including Woods, nonetheless was instructed to discharge the New Orleans pipe, although it was told to proceed as carefully as necessary, even if that meant discharging the cargo one pipe at a time.

Woods and his fellow longshoremen began to discharge the New Orleans pipe using the "break out" method, taking small quantities of pipe and attempting to maneuver them around the overlapping Houston pipe and out of the hold. The discharge proceeded uneventfully for about two hours until disaster struck. While the crew was discharging a three- or four-pipe bundle of New Orleans pipe, the forward end of the bundle became "jammed" in some overlapping Houston pipe, which caused the aft ends of one or more pieces of the New Orleans pipe to swing violently in the direction of Woods and the other longshoremen standing nearby in the hold. The longshoremen attempted to run across the uneven surface of the pipe cargo to avoid being struck by the swinging pipe. Woods was unable to avoid serious injury, however, when he fell into a gap between several pipes and was struck by the swinging pipe.

### B.

After collecting workers' compensation and medical benefits from Cooper/T. Smith, Woods and his wife sued Sammiline Company, Ltd. ("Sammiline"), the operator of the vessel, and Hightworth Shipping, Ltd. ("Hightworth"), the vessel's owner (collectively, the "owner/operator"), for damages under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). Cooper/T. Smith immediately intervened, seeking reimbursement of its payments made to Woods.

Sammiline and Hightworth denied liability; additionally, Hightworth filed a third-party complaint against Pioneer Navigation, Ltd. ("Pioneer"), the time charterer of the vessel, alleging that if the vessel interests were in any way responsible for Woods's injuries, Pioneer was the responsible party. Pursuant to Fed.R.Civ.P. 14(c), Hightworth also tendered Pioneer as

a direct defendant to the plaintiffs. To round out this flurry of procedural machinations, Pioneer cross-claimed against Hightworth, alleging that the owner/operator was solely responsible for Woods's injuries, and the Woodses then filed an amended complaint naming Pioneer as a defendant.

After a trial on the merits, the jury returned a verdict in which it found that the owner/operator, the time charterer, and the stevedore were all negligent and that each party's negligence was a legal cause of Woods's injuries. When asked to apportion responsibility for Woods's injuries, the jury found the owner/operator 10% responsible, the time charterer 25% responsible, and the stevedore 65% responsible. Finally, the jury awarded Woods $550,000 for his injuries, and Woods's wife $150,000 for loss of consortium.

The district court then considered the question of liability between the owner/operator and time charterer. It denied each party's claim for indemnity from the other and, because the stevedore was not a defendant in the action, apportioned the stevedore's 65% responsibility between the owner/operator (10/35 of 65%, or 18.57%) and time charterer (25/35 of 65%, or 46.43%) in proportion to the percentage of fault assessed by the jury against the two defendants.[1] Judgment was entered accordingly, with Cooper/T. Smith recovering its past compensation and medical expenses out of Woods's recovery.[2]

## II.

Both the owner/operator and the time charterer vigorously contest the jury's findings that they were legally responsible for Woods's injuries. Because the defen-dants filed the requisite motions for directed verdict and judgment notwithstanding the verdict, we review the jury's findings using the standard enunciated in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). Thus, we review the record to see whether "there is substantial evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions." *Id.* at 374.

### A.

Title 33 U.S.C. § 905(b), provides in pertinent part:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly....

Neither the owner/operator nor the time charterer contends that it is not amenable to suit under section 905(b);[3] rather, their first argument on appeal is simply that they have not breached any duties owed to Woods.

In *Scindia*, the Supreme Court clarified the scope of the duties owed by a vessel to stevedores and longshoremen. Starting from the general proposition that a "shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards," 451 U.S. at 170, 101 S.Ct. at 1623, the Court stated that the vessel nonetheless "owes to the stevedore and his longshoremen employees the duty of exer-

---

1. Under the rule of *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the owner/operator and the time charterer were held responsible for the stevedore's negligence as well as their own. *See Hill v. Texaco, Inc.*, 674 F.2d 447, 449 (5th Cir.1982).

2. Under the LHWCA, an injured worker's employer is entitled to reimbursement for its past compensation and medical expenses from the net proceeds of any recovery by the injured worker from a third party. *See Peters v. North River Ins. Co.*, 764 F.2d 306, 312 (5th Cir.1985).

3. Title 33 U.S.C. § 902(21) defines "vessel" as including the vessel's "owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." We have previously held that time charterers are included within the definition and are therefore amenable to suit under § 905(b). *See Kerr–McGee Corp. v. Ma–Ju Marine Servs., Inc.*, 830 F.2d 1332, 1338 (5th Cir.1987).

cising due care 'under the circumstances.' " *Id.* at 166, 101 S.Ct. at 1622 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 415, 89 S.Ct. 1144, 1150, 22 L.Ed.2d 371 (1969)). The Court identified three aspects of this limited duty, only two of which are relevant here.[4]

First, the Court indicated that the vessel must exercise ordinary care

> to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety....

*Id.*, 451 U.S. at 167, 101 S.Ct. at 1622. A corollary of this first *Scindia* duty, the Court explained, is that the vessel has a duty to warn the stevedore of any hazardous conditions on the ship or with respect to its equipment of which the stevedore cannot be expected to be aware, but of which the vessel has or should have knowledge. *Id.* Although the Court did not explicitly so hold, this duty apparently governs the vessel's conduct before stevedoring operations have begun.[5]

The third *Scindia* duty is somewhat more nebulous and applies to the vessel's responsibilities once stevedoring operations are underway. As to this duty, the Court began its discussion by again postulating that "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." 451 U.S. at 172, 101 S.Ct. at 1624. The Court reasoned, however, that a shipowner nonetheless could be liable under section 905(b) if it had actual knowledge of a dangerous condition present during the stevedoring operation and actual knowledge that the stevedore was not acting to correct it:

> [I]f [the stevedore's] judgment ... was so obviously improvident that [the vessel], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, ... [the vessel] had a duty to intervene [and correct the defect].

*Id.* at 175–76, 101 S.Ct. at 1626–27. *See also Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1038–39 (5th Cir.1983).[6]

### B.

Initially, the defendants challenge the essence of the Woodses' action by ques-

---

**4.** In what may be identified as the second *Scindia* duty, the Court stated that a vessel may be liable "if it actively involves itself in cargo operations and negligently injures a longshoreman" or if it fails to exercise due care in maintaining equipment and areas of the ship over which it has "active control" during the stevedoring operation. 451 U.S. at 167, 101 S.Ct. at 1622. The jury in this case was not charged on this theory; thus we have no reason to consider it on appeal.

**5.** *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir.1986); *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th Cir.1983); *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1246–47 (5th Cir.1982).

**6.** The *Scindia* Court uses the word "vessel" throughout, thereby arguably suggesting that the opinion applies to all parties within the statutory definition. We have previously interpreted *Scindia*, however, as establishing the duties owed to stevedores and longshoremen only by owner/operators. *See Kerr–McGee*, 830 F.2d at 1340 n. 8.

The underlying principle is that each defendant in a § 905(b) action is liable only for its own negligence, which presupposes the identifi-

cation of the specific duties owed by each defendant to the plaintiff. *Scindia* determines the duties owed by owner/operators, which have actual dominion and control over the vessel; it does not determine the duties owed by other defendants, such as time charterers, that are similarly amenable to suit under § 905(b) but whose relationships to the vessel, and therefore to the plaintiff, differ from that of the owner/operator. We thus must look to the time charterer's relationship with the vessel—primarily, as defined in the time charter—to discover the duties and responsibilities against which the time charterer's conduct must be measured. *See Kerr–McGee, id.* at 1339.

On appeal, the time charterer nonetheless proceeds to assess its own liability primarily in terms of the *Scindia* duties imposed upon owner/operators. Except where otherwise noted, therefore, we will assume that the time charterer's duties toward the stevedore and its longshoremen employees are co-extensive with the owner/operator's duties under *Scindia;* hence, we utilize the same analysis of the Woodses' claims for each defendant.

tioning whether a vessel's duties under *Scindia* extend to the vessel's cargo, as distinguished from its gear and equipment. However, settled case law in this circuit forecloses the conclusion that a vessel does not, with regard to the stevedore and longshoremen, bear any responsibility for the vessel's cargo and its manner of stowage.

The defendants' argument is predicated upon a close reading of *Scindia*, which involved a section 905(b) complaint filed by a longshoreman whose injury resulted from a ·defective winch that was part of the ship's gear being used in cargo operations. The defendants therefore argue that the Court's statements regarding an owner/operator's duties must be read as delimiting its responsibilities for the things—i.e., the ship's gear and equipment—over which it has dominion and actual control.

Thus, according to the defendants, when the Court stated that "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore," 451 U.S. at 172, 101 S.Ct. at 1624, it meant what it said. This is so, the defendants contend, because actual control—the basis for the *Scindia* duties—over the cargo and cargo operations belongs, not to the owner/operator, but to the independent stevedore.

At least one court has accepted this argument· under remarkably similar circumstances. In *Derr v. Kawasaki Kisen K.K.,* 835 F.2d 490 (3d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1733, 100 L.Ed.2d 196 (1988), two longshoremen suffered injuries while discharging cargo that had moved or shifted during the voyage after being improperly secured by the loading stevedore. The court rebuffed their attempt to hold the vessel's owner liable on the theory that it failed adequately to inspect or supervise the stowage of the cargo. Absent a contractual provision, positive law, or custom to the contrary, the court concluded,

> *Scindia* compels the holding that a shipowner has no duty to supervise or inspect cargo loaded or unloaded by stevedores and therefore may not be held liable for injuries arising out [sic] the stevedore's failure to perform his job properly.

*Id.* at 493.[7] As in *Derr,* the essence of the Woodses' claim is that the defendants failed to exercise proper control over the stowage and discharge of the pipe cargo; the defendants thus urge us to follow *Derr*'s lead and hold that a vessel cannot be held liable for injuries resulting from the negligence of an independent stevedore.

Our court, however, has already visited this question and reached the opposite result. In *Lemon v. Bank Lines, Ltd.,* 656 F.2d 110 (5th Cir. Sept.1981), decided shortly after *Scindia,* a longshoreman injured during discharge operations sued the vessel owner under section 905(b), alleging that the owner was legally responsible for the negligent manner in which the cargo had been stowed and that such negligence was the cause of his injuries. An independent stevedore had loaded the cargo, and the plaintiff sought to hold the owner liable because the chief mate had actual knowledge that the stevedore was utilizing improper loading techniques. *Id.* at 116.

Although we noted the language in *Scindia* to the effect that the shipowner has no duty to supervise cargo operations or inspect the cargo, we extended *Scindia*'s imposition of a duty on the shipowner to correct, as to all dangerous conditions including those relating to cargo, equipment-related and other defects of which it has actual knowledge and which it actually

---

**7.** In reaching its holding, the *Derr* court went so far as to assume explicitly that the shipowner had actual knowledge of the fact that the cargo was improperly secured. That fact, the court concluded, could not suffice to create liability:

> Even if it were true that a vessel customarily observes the loading of cargo, understandable in light of its potential liability for certain damage to cargo, ... we agree with the district courts that such observation cannot be used to reimpose the general duty to supervise the stevedore. Nor can such observation be vaulted into the type of active involvement and control that would trigger the ship's liability.

> 835 F.2d at 494 (citations omitted).

knows the stevedore does not intend to correct. That duty extends to conditions that arise before or during stevedoring operations. In so holding in *Lemon*, we assumed that the shipowner has at least the power to control the actions of independent stevedores: We stated that this duty "furnishes an incentive to the shipowner to correct those dangerous conditions he recognizes in addition to those he actually creates." *Id.* at 115.

Without questioning our assumption that such power exists in theory and practice, we have continued to follow our holding in *Lemon. See Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 299 (5th Cir.1984). Because we are bound by this court's prior decisions unless and until they are reconsidered *en banc*, we must decline to accept the defendants' argument that an owner/operator owes no duties to a stevedore and longshoreman with respect to cargo operations that are solely within the stevedore's control.[8]

### C.

The Woodses claim that the owner/operator and the time charterer breached both of the above duties in three ways. Firstly, they contend that the two defendants, in violation of the first *Scindia* duty, were negligent in failing to ensure that the loading stevedore in Brazil stowed the pipe cargo in such a manner that it could be discharged in New Orleans with reasonable safety. Secondly, and also under the first *Scindia* duty, they contend that the defen-

dants failed to warn Woods and his fellow longshoremen of the "hidden danger" presented by the gaps in the pipe cargo allegedly caused by the lack of dunnage and the loose stow. Their third theory of liability is that, because the pipe cargo as stowed could not be discharged with reasonable safety, the defendants, pursuant to the third *Scindia* duty, should have stopped the stevedore from proceeding to discharge the New Orleans pipe without first discharging the overlapping Houston pipe.

The district court charged the jury on all three theories of liability. Although it submitted the case to the jury on special interrogatories, the relevant interrogatory as to each defendant asked only whether that defendant was "negligent," to which the jury could answer "yes" if it found that defendant liable under any one or more of the three theories. In most cases, "[w]here two [or more] claims have been submitted to the jury ... in a single interrogatory, a new trial may be required if one of the claims was submitted erroneously," unless we are " 'reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it.' " *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir.), *cert. denied*, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984) (quoting *E.I. duPont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1258 n. 8 (8th Cir.1980)). Thus, if we find that the defendants were entitled to a directed verdict on any one of the three theories of liability, we must remand the case for a new trial unless we are "reason-

---

**8.** Even if we were able to accept the defendants' argument as to owner/operators, it is by no means clear that the same conclusion would obtain for time charterers. Again, the theory underlying the argument is that the owner/operator does not have practical dominion and control over cargo operations, the responsibility for which *Scindia* places in the hands of independent stevedores. At least in this case, however, practical dominion and control over the stevedores' actions may exist in the time charterer, which hired both the preparer of the cargo plan for the vessel and the loading and unloading stevedores. Presumably, it could have directed the stevedores' actions in accordance with its wishes, notwithstanding the fact that the stevedores legally may have been independent contractors.

The status of the relationship between time charterer and the stevedores thus suggests that it is not unreasonable to place upon the time charterer some duty to exercise reasonable care in its actions with respect to the cargo and its stowage. Thus, even if the time charterer does not have a duty of supervision and inspection, it nonetheless may have a duty to correct hazardous cargo conditions of which it has actual knowledge, for the simple reason that it has the practical ability to correct such conditions. Because we follow this court's precedent in holding that *Scindia* extends to conditions wholly within the cargo and its method of stowage, however, our discussion is restricted to pointing out the limitations of the defendants' argument and of the *Derr* court's reasoning.

ably certain" that the jury's verdict was not based upon the erroneously-submitted theory or theories.

### 1.

■ As noted, *supra,* it is the law in this circuit that, under the first *Scindia* duty, a vessel interest has an obligation to exercise due care to ensure that the vessel's cargo is loaded such that it can be discharged with reasonable safety.[9] The defendants may be found liable "for damages arising from a dangerous stow [in] situations where the [defendants] knew or should have known of the dangerous condition." *Harris,* 730 F.2d at 299 (citing *Lemon,* 656 F.2d at 116). In this case, neither defendant denies actual knowledge of the overlapping condition of the cargo; rather, they contend that the evidence does not establish either that the overlapping condition created an unreasonable risk of harm to the longshoremen or that they can be charged with knowledge of such a risk if it did exist. We disagree.

In *Harris,* a longshoreman sued a vessel owner after being injured while unloading sacks of coffee from the vessel. The sacks were not "tied," a procedure in which the sacks are stacked to provide greater stability, nor were they separated by dunnage, which are wood platforms placed every five sacks high. According to testimony from the injured worker and his fellow longshoreman, the stow was "dangerous" in that the coffee was "very, very poorly stored." Additional testimony indicated that it was customary in the industry for the ship to decide whether to use dunnage,

that the use of dunnage involved added expense, and that the owners of the vessel never used dunnage.

We reversed the district court's grant of a directed verdict for the vessel owner. Although our attention was focused primarily upon whether the obviousness of the danger presented by the stow relieved the vessel owner of liability, our conclusion regarding the legal sufficiency of the evidence described above is unmistakable:

> The evidence presented by Harris would have been sufficient to support jury findings that Grancolombiana was negligent in providing an unreasonably dangerous place to work and that Harris's injuries were caused by this dangerous condition. The case should not have been taken from the jury....

*Id.* at 300.

Our holding in *Harris* guides our determination of the defendants' sufficiency-of-the-evidence argument on this point. As in *Harris,* there was ample testimony in this case to support a jury finding that the overlapping condition of the cargo meant that the New Orleans pipe could not be discharged with reasonable safety. Testimony at trial indicated that an overlapping stow was unusual, that it increased the risk of damage to the cargo and injury to the longshoremen, and that those risks could have been avoided by either stowing the Houston pipe without having it overlap the New Orleans pipe—as was contemplated by the cargo plan prepared for the time charterer—or unloading the overlapping Houston pipe before unloading the New

---

9. *See Harris,* 730 F.2d at 299 (analyzing a shipowner's actions regarding the stowage of cargo under the first *Scindia* duty); *Lemon,* 656 F.2d at 112, 116 (finding evidence sufficient to support a jury verdict that the shipowner had "breached a [*Scindia*] duty owed to longshoremen to exercise reasonable care in providing a reasonably safe work place" because the shipowner "was negligent in the method and manner of stowing the cargo"). Although we noted in *Harris* that "[i]f an independent contractor performs the loading operations, and the shipowner reasonably has no knowledge of a dangerous condition thereby created, the owner may escape liability," 730 F.2d at 299 n. 2, the

cases cited for this proposition limit the scope of this exception to independent contractors "over whom [the shipowner] retained no control." *Moser v. Texas Trailer Corp.,* 694 F.2d 96, 98 (5th Cir.1982). As we note *infra,* both the owner/operator and the time charterer had, in both theory and practice, authority to control the actions of the loading stevedore in Brazil. The owner/operator's claim that it exercised actual control over cargo operations only insofar as they affected the seaworthiness and safety of the vessel may be a correct empirical statement, but it does not mean that it is relieved of the duties imposed upon it by, e.g., *Scindia, Lemon,* and *Harris.*

Orleans pipe.[10] In sum, there is ample evidence from which a jury could conclude that the defendants therefore did not exercise reasonable care in providing the longshoremen with a reasonably safe place in which to work.

The defendants offer two arguments against this conclusion. Firstly, they assert that, although there was evidence that the overlapping condition of the cargo meant that the discharge would have to proceed "slowly," there was no evidence that the condition of the cargo presented an unreasonable risk of harm to the longshoremen. Secondly, they contend that there was no evidence that the defendants, through their employees, had any knowledge that the stow presented an unreasonable risk of harm.

The defendants' first argument is plainly foreclosed by *Harris*. There, evidence that a stow was "dangerous" and "very, very poor[ ]" was held to be sufficient to support a jury finding of negligence; we did not require that the record contain testimony, almost of a talismanic quality, that the stow be "unreasonably" dangerous or that the cargo could not be discharged with "reasonable" safety. We similarly refuse to do so here.

■ Whether a stowage method is reasonable depends upon a myriad of factors, including the absolute and relative danger which it presents vis-a-vis other stowage methods, and the feasibility of such other methods. In essence, the question is how a reasonable vessel interest exercising due care would allow the cargo to be stowed, and what it would conclude about its stowage methods. The evidence in this case is sufficient for a reasonable jury to conclude that a reasonable vessel interest would not permit the cargo to be stowed in this manner because of the danger to property and life which the stow would present.

The defendants' second argument is similarly without merit. They do not and cannot deny that they were aware of the overlapping condition of the cargo; the record establishes beyond doubt that the owner/operator knew in Brazil that the cargo was being stowed in an overlapping fashion and that the overlap continued to exist when discharge operations began in New Orleans.[11] *Cf. Lemon*, 656 F.2d at 116. Their contention is only that they did not have actual knowledge of the danger which this condition presented such that liability may attach under *Scindia*.

■ But the defendants misread *Scindia*. Under the first *Scindia* duty, there is no requirement that the vessel have actual knowledge of the danger presented before liability will attach. Rather, that duty speaks only in terms of a failure to exercise due care (although we measure its duty with regard to, not the ordinary stevedore, but an "expert and experienced" stevedore exercising "reasonable care"). The law of negligence has never required that a tortfeasor actually be aware of the risks which its actions create before it may be held liable,[12] and *Scindia* does not add such a requirement in this context. *See Harris*,

---

**10.** We acknowledge that unloading the Houston pipe first would have involved considerable expense to the time charterer, but that fact does not change our conclusion. There is some evidence that the time charterer originally intended to have the ship dock in Houston and discharge the Houston pipe before going to New Orleans, but that, while the ship was at sea, the charterer instructed the vessel to proceed first to New Orleans. Had the vessel gone to Houston first as planned, there would be no question but that the stow would have been reasonable; but once the decision was made to discharge the New Orleans pipe first, the defendants were under a duty to reevaluate the condition of the stow and determine what steps, if any, needed to be undertaken to ensure a reasonably safe discharge.

**11.** To the extent that the time charterer can be charged with at least part of the responsibility for the manner in which the pipe cargo was loaded in Brazil, *see infra* Part III.B, its liability can be justified along the same lines as for the owner/operator. *See Kerr–McGee*, 830 F.2d at 1341 ("Certainly the time-charterer has some responsibilities. It designates the cargo that the chartered vessel will carry, and if, for example, it carelessly chooses an unsafe combination of cargo to share the same hold, it could be liable for resulting damages. The time-charterer directs where and when the vessel will travel....").

**12.** *See* W. Keeton, *Prosser & Keeton on the Law of Torts* § 31 at 169 (5th ed.1984).

730 F.2d at 299 (defendants may be liable under the first duty "[in] situations where the [defendants] *knew or should have known* of the dangerous condition") (emphasis added). All that is required is that the injury that results from the failure to exercise due care be reasonably foreseeable—and in this case a reasonable owner/operator and time charterer would have perceived the dangers presented by the overlapping condition of the cargo.

### 2.

■ The defendants also contend that the evidence is insufficient to support a finding of liability on the theory that the gap in the pipe cargo into which Woods fell was a "hidden danger" such that the defendants were obligated to warn Woods of its existence. We agree that this theory of liability should not have been submitted to the jury.

An owner/operator is charged with the duty of warning the stevedore and longshoremen about

> any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known to the stevedore and would not be obvious to or anticipated by

him if reasonably competent in the performance of his work.

*Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. The undisputed testimony in this case is that the existence of gaps in loosely-stowed pipe is a common phenomenon and, even if not discovered or created until discharge operations began, was open and obvious to Woods, his fellow longshoremen, and anybody who looked into the hold.

The "failure" of the defendants to inform Woods of such an obvious condition cannot serve as a basis for liability. *See Morris v. Compagnie Maritime des Chargeurs Reunis, S.A.,* 832 F.2d 67, 69–71 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988).[13] The "hidden danger" theory of liability thus should not have been submitted.

### 3.

■ Finally, the defendants claim that the evidence was insufficient to support a jury finding that they breached the third *Scindia* duty, which requires a shipowner to intervene in stevedoring operations if it has (1) *actual* knowledge of a dangerous condition that develops during the course of those operations and (2) *actual* knowledge that the stevedore has failed to remedy it. *See Helaire,* 709 F.2d at 1038–39. Although we have serious doubts as to whether the third *Scindia* duty is even applicable to this case,[14] the defendants do

**13.** *Morris* indicates that even an "open and obvious" hazard may nonetheless serve as a basis for liability if the stevedore has no alternative to exposing himself to the danger other than leaving his job or facing criticism for delaying work. *See* 832 F.2d at 70. This theory—that the vessel cannot defeat liability by asserting that the stevedore has exposed himself to an open and obvious hazard created by the vessel, unless the evidence shows that the stevedore decided to forego reasonable alternatives to exposing himself to the hazardous condition— runs throughout our discussions of a vessel's duties under *Scindia. See Teply v. Mobil Oil Corp.,* 859 F.2d 375, 378 (5th Cir.1988); *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 882 (5th Cir.1983). In such circumstances, however, liability is more properly based, not upon the "hidden danger" theory, but upon the theory, described *supra,* that the defendant has failed to exercise due care to provide the stevedore with a reasonably safe workplace. The

danger is no longer "hidden" in any sense of the word, but may nonetheless serve as a basis for liability if the vessel has a responsibility to prevent its creation or correct it once it exists. *See Lemon,* 656 F.2d at 116; *Teply,* 859 F.2d at 378; *Spence v. Mariehamns R/S,* 766 F.2d 1504, 1507 (11th Cir.1985).

**14.** In *Harris,* we distinguished the two relevant *Scindia* duties along the following lines:

> *Scindia* was primarily concerned with a dangerous condition that *develops* within the confines of cargo operations after the stevedore takes control. The Court noted that a stevedore then becomes primarily responsible for the safety of the longshoreman and 'the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of cargo operations that are assigned to the stevedore.' ... The Court reasoned that liability would fall on the ship-

not challenge the jury's finding on this ground; rather, they contend that there was no evidence to support a jury finding that they had actual knowledge of the hazard created by the overlapping condition of the cargo. We agree.

In instructing the jury on the third *Scindia* duty, the district court stated that the defendants could be found to have been negligent only if, *inter alia,* they "had actual knowledge that the condition would pose an unreasonable risk of harm to the longshoremen working on board the ship." Neither party objected to this instruction.

A review of the record convinces us that no reasonable jury could find that the defendants had actual knowledge that the overlapping condition of the cargo posed an unreasonable risk of harm to Woods and his fellow longshoremen.[15] There is ample evidence that the defendants were aware of the overlapping condition of the cargo; conversely, there is no evidence that the defendants were actually aware that an "unreasonable risk of harm" was thereby created. The only evidence that might possibly support such a conclusion is testimo-

ny that the foreman of Woods's crew told one of the ship's officers that the pipe would have to be discharged "slowly" because of the overlap; standing by itself, that statement falls well short of putting the vessel interests on notice that the overlap created an unreasonable risk of harm to the longshoremen. In short, the Woodses failed to pierce the defendants' claims of blissful ignorance of the danger presented by the stow; no reasonable jury could therefore have found, in accordance with its instructions, that the defendants breached the third *Scindia* duty.

### D.

Having thus found that the district court erred in submitting two of the Woodses' three theories of liability to the jury, we have little choice but to vacate the judgment and remand for a new trial. Although the "hidden danger" theory played only a minor role at trial, the issue of the defendants' liability under the third *Scindia* duty was strenuously litigated by both sides, and occupies a major portion of the

---

owner only if he knew of the later-developed danger and also knew that the stevedore was not taking steps to cure it.

> *Scindia* also described the more general aspects of a shipowner's duty to longshoremen. Thus, the shipowner must exercise care to deliver to the stevedore a safe ship with respect to 'the ship's gear, equipment, tools, and work space to be used in the stevedoring operations.'

730 F.2d at 298–99 (quoting *Scindia,* 451 U.S. at 167, 172, 101 S.Ct. at 1622, 1624) (citations omitted, emphasis in original). Accordingly, we explicitly stated in *Harris* that a shipowner's actions regarding the improper stowage of cargo—a condition that comes into existence before the discharging stevedore assumes control of cargo operations—are not to be judged by reference to the third *Scindia* duty:

> The jury in *Lemon* found that the shipowner breached a duty to exercise reasonable care in failing to provide a reasonably safe place to work.... We were not concerned in *Lemon,* nor are we concerned here, with dangerous conditions that develop only after control of the ship has been given to the stevedore.

*Id.,* at 299.

Under the law of this circuit, therefore, the jury should not have been charged on the third *Scindia* duty. Because the defendants, preferring to concede that the third duty applied and to argue that the evidence was insufficient to

support a finding that it had been breached, did not raise this issue in their motions for directed verdict and j.n.o.v., we cannot find error on this ground. *See* Fed.R.Civ.P. 50(a) ("A motion for directed verdict shall state the specific grounds therefor."); *Dimmitt Agri Industries, Inc. v. CPC Int'l Inc.,* 679 F.2d 516, 521 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 846 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 67–68 (5th Cir.1972).

**15.** It is important to contrast this requirement under the third *Scindia* duty with the requirements of the first *Scindia* duty. Under the first duty, all that is required is that the shipowner "knew or should have known," *see Harris,* 730 F.2d at 299, of the dangerous condition; actual knowledge of the condition or the resulting hazard is not required. Under the third *Scindia* duty, however, such actual knowledge of the hazard is required. Thus, it is entirely possible to conclude that the defendants breached the first *Scindia* duty on the theory that they should have known that the overlapping condition was unreasonably hazardous while also concluding that no breach of the third *Scindia* duty occurred because the defendants lacked *actual* knowledge.

court's instructions to the jury. Moreover, because both the elements of the third *Scindia* duty and the actions to which it applies are different from those encompassed by the first duty, we cannot feel confident that the jury's finding of liability was based solely upon the first duty, or that a jury that found a breach of the third duty would necessarily find a breach of the first. Because we do not feel "reasonably certain" that the jury's verdict was not influenced by the erroneously-submitted second and third theories of liability, we remand for a new trial.

## III.

In addition to their sufficiency arguments, the defendants have raised several other issues on appeal. As to certain of these issues—relating to jury instructions and the division of liability between the defendants—it is likely that the district court will have to confront them again on remand. Lest the court's rulings on these issues be the subject of appeal after the new trial, and therefore grounds for reversal and yet another new trial, we address these issues now to provide guidance for the district court in its future conduct of the case.

### A.

 The defendants contend that the district court erred by denying their request that the jury be instructed that a vessel owner

> may reasonably rely on a stevedore's judgment that a condition, though dangerous, is safe enough for the longshoremen to work without injury. Thus, even if the plaintiff could establish that the vessel owner had knowledge [of the dangerous condition], the vessel owner still would be entitled to rely on the stevedore's judgment that the condition presented, though dangerous, was safe enough for the longshoremen to work.

The defendants contend that the requested instruction correctly states the law in this circuit as set forth in *Helaire v. Mobil Oil*

16.  *See, e.g., Barrios v. Pelham Marine, Inc.,* 796 F.2d 128, 132 (5th Cir.1986) ("Although in some

*Co.,* 709 F.2d 1031, 1039 n. 12 (5th Cir. 1983). We disagree.

Just as the trial court is obligated to instruct the jury on the law underlying the plaintiff's theory of recovery, it must do so as to defensive theories as well. *See Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 425 (5th Cir.1985). The defendant's proffered instruction, however, must be legally correct and supported by the evidence; moreover, the court may refuse to give such instruction if the instructions that it does give cover the theory in substance, as it is the court and not the parties that has control over the language and form of the instructions. *See id.* at 425 n. 10.

 In this case, we agree with the district court's conclusion that the requested instruction "misstate[s the law] so badly that it's almost scary." *Helaire* stands for the eminently sensible proposition that, in determining whether an owner/operator or time charterer has fulfilled its section 905(b) duties, the jury may consider the reasonableness of the stevedore's judgment in determining whether the vessel interests have acted reasonably:

> The opinion in *Scindia* recognized that the owner's actual knowledge of a dangerous condition which later injured a longshoreman might not in itself make him negligent. It might well be 'reasonable' for the owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough.

709 F.2d at 1039 n. 12 (citing *Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626). *Scindia* makes it plain, however, that there are circumstances in which a stevedore's judgment will be so "improvident" that the owner/operator, if it has the requisite actual knowledge of the situation, is required to overrule the stevedore's judgment and take steps to correct a hazard. Similarly, it is the acknowledged rule in this circuit that a stevedore's decision to proceed in the face of an open and obvious hazard will not automatically immunize a defendant from section 905(b) liability.[16]

circumstances '[i]t might well be "reasonable" for the [ship] owner to rely on the stevedore's

The requested instruction, by advising the jury that the defendants "would be entitled to rely" upon the stevedore's judgment, does not acknowledge these exceptions. The district court, which properly instructed the jury that "[a]s a general matter, the ship owner/operator and the charterers may rely on the stevedore to avoid exposing longshoremen to unreasonable hazards," correctly rejected the request to charge the jury on the defendants' view of the law.

### B.

The time charterer also challenges the district court's refusal to instruct the jury (1) that the time charterer could be at fault only to the extent that it exercised actual supervision or control over the loading operations in Brazil, (2) that the party that prepared the stowage plan and the loading stevedores were independent contractors, and (3) that the time charterer bore no duty to supervise the actions of the independent contractors and was not responsible for their negligent acts unless the jury found that the time charterer "directly" controlled and supervised their actions. We find no error in the court's decision not so to charge the jury.

■■■ Again, we review the court's decision under the standards of review set forth in *Pierce*. The first requested instruction plainly misstates the Woodses' theories of liability against the time charterer by completely ignoring the theory that the time charterer's responsibilities included taking corrective actions—in the form of instructing or authorizing the stevedore to unload the overlapping Houston pipe before it discharged the New Orleans pipe—once the pipe cargo was improperly stowed in Brazil. The requested instruction is thus incorrect when it states that the time charterer could be at fault "only to the extent that it exercised actual supervision or control over the loading operations."

■■■ The court's refusal to give the time charterer's second and third requested instructions was also proper. A party is entitled to have the jury charged on a defensive theory only if the theory is supported by the evidence. *See Pierce*, 753 F.2d at 425. Although we have consistently held that "a principal ... who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors," *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir.1984), the record in this case reveals that the time charterer did exercise substantial control over the actions of its representatives in Brazil.

There was substantial communication between Borda Livre (the time charterer's alleged "independent contractor" in Brazil who prepared the cargo plan, inspected the cargo, and mediated between the time charterer's representatives, the loading stevedores, and the time charterer) and the time charterer itself. These communications included instructions from the time charterer that Borda Livre arrange certain cargoes in a certain manner to facilitate discharge. Thus, even if Borda Livre and the loading stevedores are considered independent contractors, the evidence establishes that the time charterer had the theoretical and practical ability to control their actions and actively did so on at least one occasion. The district court did not err by refusing to give the requested instructions.

### IV.

After the jury rendered its answers to interrogatories on the issues of liability and damages, the district court proceeded to consider each defendant's claim that it was entitled to indemnity from the other defendant; the court also considered the allocation of responsibility for the percentage of fault ascribed to the stevedore, Cooper/T. Smith. The district court denied both the owner/operator's and the time charterer's claims for indemnity and allocated the ste-

judgment that the condition, though dangerous, was safe enough,' *Helaire*, 709 F.2d at 1039 n. 12, it was not reasonable in this case for [the

ship owner] to rely on [the stevedore's] judgment that the conditions were adequately safe.").

vedore's percentage of fault between the two defendants according to their own respective percentages of fault. The court was correct in so doing.

### A.

■ In essence, the quarrel between the two defendants with regard to the indemnity issue is over who should be held responsible for the failure of the loading stevedore in Brazil to stow the pipe cargo so that it could be unloaded with reasonable safety. The time charterer argues that the terms of the charter party require a conclusion that at all times the owner/operator retained operational control over cargo operations, thus contractually precluding any imposition of liability upon the time charterer. Although we agree with the time charterer's interpretation of the charter party, we also agree with the district court that, going beyond the terms of the charter party, the time charterer did exercise some degree of operational control over cargo operations and thus can be held responsible for its own negligence.

The charter of the vessel was on a New York Produce Exchange (Government Form) Time Charter, a commonly-used document in the industry. Clause 8 of the time charter provides in pertinent part as follows:

> The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency, and Charterers are to load, stow, and trim, and discharge the cargo at their expense under the supervision of the Captain....

The time charterer, relying upon our opinion in *D/S Ove Skou v. Hebert*, 365 F.2d 341 (5th Cir.1966), *cert. denied*, 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), contends that this contractual provision leaves operational control over cargo operations in the owner/operator, thus making it

solely responsible for any injuries resulting from the manner in which the cargo was stowed.

In *Ove Skou*, a shipowner held liable for a longshoreman's injuries resulting from the loading stevedore's negligence in securing a hatch sought indemnity from the time charterer under the theory that, by an extension of *Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the time charterer impliedly warranted that the loading stevedore would perform its job in a workmanlike manner. *See* 365 F.2d at 351. We rejected the shipowner's argument, holding that no such warranty existed.

Essential to our holding was the conclusion that the provision from the charter party quoted above does not shift operational control over cargo operations, and therefore responsibility for the actions of independent stevedores, from the shipowner to the time charterer:

> [C]lause [8], specifying that the captain shall be under the orders of the Charterers 'as regards employment and agency' and that 'charterers are to load, stow, and trim the cargo' does not give to Time Charterer any operational control over these activities. Rather, these charter party provisions are essentially a specification of the party—owner or charterer—upon whom the ultimate financial cost rests for any one or more of the activities.
>
> ... In the absence of circumstances which would give rise to a liability for actions taken by an independent contractor—none of which are present here—Time Charterer had no responsibility to Shipowner or to third persons including longshoremen for acts of omission or commission by the stevedores.

*Id.* (footnote omitted).[17] Thus, considering solely the issue of the contractual allocation of responsibility between the parties,

---

17. *See also Mallard v. Aluminum Co. of Canada,* 634 F.2d 236, 242 n. 5 (5th Cir.1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). There, we reasoned as follows:
> [*Ove Skou*] ... holds that ... clause [8] makes a charterer responsible for the costs of cargo handling, but in and of itself does not

transfer operational responsibility from the owner.... In light of *Skou,* this circuit seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect.

*Ove Skou* compels the conclusion that, absent evidence to the contrary, the time charterer bears no responsibility to the owner/operator or third parties for the negligent acts of the loading stevedore.[18]

Unfortunately for the time charterer in this case, however, there is evidence that, notwithstanding the contractual allocation of operational control over, and attendant responsibility for, cargo operations, it did have some degree of operational control over the loading operation. As noted above, there were extensive communications between the time charterer and its representatives in Brazil regarding the cargo and the manner in which it was to be loaded. The time charterer's instructions regarding the cargo, and its decision to go to New Orleans first instead of Houston, despite the fact that the cargo was loaded with a different itinerary in mind, indicate that the time charterer did not just pay the bills for cargo operations that took place beyond its control.

Although clause 8 in the charter party may preclude visiting liability upon the time charterer for the owner/operator's negligence, it does not preclude holding the time charterer liable for its own negligent acts or for the negligent acts of parties in Brazil over whom it exercised control. Indeed, this is precisely the case contemplated in *Ove Skou,* in which we stated that there may be "circumstances which would give rise to a liability for actions taken by an independent contractor." 365 F.2d at 351. *See also Kerr–McGee Corp. v. Ma–Ju Marine Servs., Inc.,* 830 F.2d 1332, 1342 (5th Cir.1987). Because the jury found the time charterer itself to be negligent, it is not entitled to indemnity from the owner/operator.

■ Nor is the owner/operator entitled to indemnity from the time charterer. As noted above, clause 8 does not make the ship's master or other members of its crew the time charterer's agents with respect to all of their decisions, regarding the cargo, made during cargo operations. Each party exercised some control over cargo operations and could have acted to ensure that

**18.** The owner/operator's attempts to distinguish *Ove Skou* or otherwise to convince us that the case has not survived the ravages of time are to no avail. The force of *Ove Skou's* reasoning—that the contractual language "in and of itself," *Mallard, id.,* does not shift any operational control from the shipowner to the time charterer—has not been vitiated by the fact that the shipowner can no longer seek indemnity from the negligent stevedore, by the fact that the case may have been based upon an unseaworthiness rather than a negligence standard, or by the fact that the accident in that case arguably involved the ship's gear rather than its cargo. The *Ove Skou* court's interpretation of the contractual language did not turn upon—indeed, did not even mention—these facts; rather, it looked solely to the language of the contract. None of the numerous changes in the law since the time of that decision convinces us that our reasoning is no longer valid. Despite the fact that other circuits have seen fit to reject *Ove Skou* and hold that the charter party does shift operational control over cargo operations to the time charterer, *see Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1305–06 (9th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 278 (1982); *Fernandez v. Chios Shipping Co., Ltd.,* 542 F.2d 145, 151–53 (2d Cir.1976), both the holding and reasoning of *Ove Skou* are alive and well in this circuit, and with good reason.

The owner/operator also argues that the rule of *Ove Skou* has been altered by some of our later opinions and that the owner/operator should be entitled to indemnity from the time charterer because the ship's master is, by contract, the time charterer's agent during cargo operations. The cases to which the owner/operator refers us hold that clause 8 may be read as providing that the captain's decisions regarding the "safety of the *cargo,*" as opposed to cargo-related decisions going to the seaworthiness and safety of the *vessel,* are made on behalf of the time charterer, with the charterer therefore assuming responsibility for them. *See Nitram, Inc. v. Cretan Life,* 599 F.2d 1359, 1366 (5th Cir.1979); *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422, 433 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969).

Both of these cases, however, involved questions regarding responsibility for damage to the cargo rather than for injuries to persons covered by the LHWCA, and neither case cites *Ove Skou.* It is entirely possible to reconcile the two lines of cases by stating that, although clause 8 leaves complete operational control over cargo operations in the shipowner, the time charterer nonetheless has assumed responsibility for some portion of the shipowner's decisions—but only that specified by contract. In any event, to the extent that the two sets of cases are arguably inconsistent, *Ove Skou,* being the earlier decision, is controlling in this case. *See United States v. Edelman,* 873 F.2d 791 (5th Cir.1989) (per curiam).

the cargo was loaded in such a manner that cargo operations would proceed with reasonable safety. Each such party therefore was charged with a duty to third parties regarding the manner in which the cargo was stowed. Because they have not, by contract, shifted their responsibility for the manner in which those duties were exercised, neither party is entitled to indemnity from the other.

### B.

■ Each defendant contends that the other defendant should be solely responsible for Cooper/T. Smith's negligence. The time charterer argues that the owner/operator should be solely liable because only it was in a position to prevent Cooper/T. Smith from performing its functions negligently. Conversely, the owner/operator contends that the time charterer should be responsible because it was the party that hired Cooper/T. Smith.

Notwithstanding the defendants' competing arguments, we find no error in the court's *pro rata* allocation of the stevedore's fault between the two defendants. Both parties were found to be liable in this case, not only because they were responsible for the events that led to the cargo's reaching New Orleans in the condition it did, but because they failed to take corrective action once the cargo arrived there. Neither party disputes its power, had it chosen to exercise the same, to direct Cooper/T. Smith's actions in unloading the cargo. Both parties, through their actions and their failures to act, set the stage for the accident, even if that event required the negligence of another party to appear on the scene before it could occur. Allocation of the fault between them on a *pro rata* basis is thus entirely reasonable.

### V.

Because the jury should not have been charged on two of the Woodses' three theories of liability, we VACATE the judgment of the district court and REMAND for a new trial.