USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1253

 JOSEPH ENGLAND,

 Plaintiff, Appellee,

 v.

 REINAUER TRANSPORTATION COMPANIES, L.P.,

 Defendant, Appellant.

 ____________________
 
 HALE INTERMODAL MARINE COMPANY,
 
 Defendant, Appellee.
 
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Douglas P. Woodlock, U.S. District Judge]
 
 
 
 Before
 
 Lipez, Circuit Judge,
 Coffin and Campbell, Senior Circuit Judges.
 
 
 
 
 Seth S. Holbrook with whom Stephanie J. Lyons was on brief for
appellant.
 David J. Ansel for Joseph England.

October 22, 1999

 
 
 COFFIN, Senior Circuit Judge. In June 1996, longshoreman 
Joseph England was seriously injured when a mooring line, binding
a barge to the pier on which he was working, burst and struck him
in the knee. Appellee England brought claims of negligence under
the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. 
901-950, against both the tug boat owner and the barge owner.
Following the jury's verdict that all three parties were partially
negligent, the tug owner filed post-judgment motions seeking a new
trial on various grounds. The tug company appeals the denial of
its motions. Finding no error, we affirm.
 I. Background
 We relate the facts in the light most favorable to the jury's
verdict consistent with support in the record. See United States
v. Rodriguez, 162 F.3d 135, 140 (1st Cir. 1998). On June 25, 1996,
England, a longshoreman employed by P&W Marine Service, was
overseeing a gang of twelve longshoremen unloading and then loading
cargo onto a barge, the Norfolk Trader. The tug John Reinauer,
owned by Reinauer Transportation Company, towing the unmanned barge
Norfolk Trader, owned by Hale Intermodal Marine Company, arrived at
Moran Terminal at approximately 5:00 a.m. The tug crew secured the
mooring lines on the barge; a team of line handlers received the
lines thrown off the barge by the tug crew and placed them over
bollards on the pier. The line handlers were employed by Hale for
the limited purpose of assisting with the mooring and unmooring of
the barge, but were not on site during cargo operations. 
 At approximately 8:00 a.m., just before the longshoremen were
to begin unloading the barge, the tug crew inspected the mooring
lines. The longshoremen ceased working for ten minutes at
approximately 10:00 a.m., awaiting further loading instructions. 
The tug crew did not inspect the mooring lines during that break. 
Between 10:30 and 10:45, the tug's captain left the boat to make a
phone call and testified that from the bow of the barge he viewed
the entire row of mooring lines tying the barge to the pier. 
Shortly thereafter, the line attaching the stern of the barge to
the pier burst, striking England, fracturing his kneecap, and
rendering him disabled as a longshoreman. After a trial in October
1998, the jury found all three parties to be contributorily
negligent and awarded England damages based on the following
division of fault: Reinauer 58%; Hale 35%; England 7%. The
jury was not, however, asked to specify what duty or duties it
found each party to have breached. 
 During its cross-examination of England, Reinauer was
prevented from introducing evidence that England received workers'
compensation and medical benefits during his unemployment. 
Following the close of England's case-in-chief, Reinauer made a
motion, which it renewed several times thereafter, for judgment as
a matter of law or in the alternative a new trial, contending,
inter alia, that the evidence was insufficient to establish that it
owed England any duty and that the court had erred by excluding
evidence of England's collateral source benefits. Reinauer also
filed a post-judgment motion for disclosure of the terms of a
settlement agreement that was reached by Hale and England after the
close of all evidence but before the jury's verdict. On appeal,
Reinauer contends that the court erred in denying its motions.
 II. Discussion
 We begin with a brief acknowledgment of the appropriate
standards of review. We review the court's denial of Reinauer's
motion for judgment as a matter of law de novo, but we examine the
"evidence and the inferences to be extracted therefrom in the light
most hospitable to the nonmovant, and may reverse the denial of
such a motion only if reasonable persons could not have reached the
conclusion that the jury embraced." Sanchez v. Puerto Rico Oil
Co., 37 F.3d 712, 716 (1st Cir. 1994). We review the court's denial
of Reinauer's alternative request for a new trial for an abuse of
discretion, recognizing that "the trial judge may set aside a
jury's verdict only if he or she believes that the outcome is
against the clear weight of the evidence such that upholding the
verdict will result in a miscarriage of justice." See Conway v.
Electro Switch Corp., 825 F.2d 593, 598-99 (1st Cir. 1987). 
Finally, regardless of whether Reinauer's motion for disclosure of
the terms of the Hale-England post-trial settlement agreement is
categorized as a discovery request (because it seeks disclosure to
itself and to the court) or an evidentiary request (because it
seeks disclosure to the jury), the court's disposition of the
motion is committed to its sound discretion. See Santiago v.
Fenton, 891 F.2d 373, 379 (1st Cir. 1989) (stating that the trial
court has broad discretion in determining the scope of discovery);
United States v. Cardales, 168 F.3d 548, 557 (1st Cir. 1999) (noting
that evidentiary rulings are reviewed for an abuse of discretion).
 A. Reinauer's Duty to England
 The Longshore and Harbor Workers' Compensation Act (LHWCA), 33
U.S.C. 901-950, establishes workers' compensation benefits for
longshoremen injured in work-related accidents. See 33 U.S.C. 
903(a). Regardless of fault, the longshoreman's employer must
compensate the injured worker and his or her family with medical,
disability, and death benefits. See id. 904, 907-909. The
LHWCA also allows a longshoreman to seek damages against a third-
party vessel owner for injuries resulting from the vessel's
negligence. See id. 905(b). The statute does not define what
actions constitute negligence, and thus individual questions must
be resolved largely by the application of general tort principles. 
See Howlett v. Birkdale Shipping Co., 512 U.S. 92, 97-98 (1994). 
 The Supreme Court has, however, in Scindia Steam Navigation
Co. v. De Los Santos, 451 U.S. 156 (1981), provided guidance as to
the main attributes of a shipowner's duty to longshoremen. In
Scindia Steam, the Court outlined the application of 905(b) to
relations between a longshoreman and a vessel owner and placed the
primary responsibility for avoiding accidents on the stevedore
because he was "in the best possible position to avoid accidents
during cargo operations." See id. at 164-72. Generally, the
vessel owner has the right to expect that the stevedore will
perform his task safely and properly "without supervision of the
ship." See id. at 170. Nevertheless, the Court noted situations
in which a shipowner's duty to exercise due care arises and
delineated three aspects of the duty. See id. at 166-72; see also
Howlett, 512 U.S. at 98 (characterizing the Scindia Steam decision
as outlining three aspects of the shipowner's duty).
 First, the shipowner has a "turnover duty" to warn the
longshoremen of hazards from gear, equipment, tools, and workspace
to be used in cargo operations "[t]hat are known to the ship or
should be known to it in the exercise of reasonable care." Scindia
Steam, 451 U.S. at 167; see also Howlett, 512 U.S. at 98. Second,
the vessel is liable for a breach of its "active control duty" if
it "actively involves itself in the cargo operations and
negligently injures a longshoreman" or "if it fails to exercise due
care to avoid exposing longshoremen to harm from hazards they may
encounter in areas, or from equipment, under the active control of
the vessel during the stevedoring operation." Scindia Steam, 451
U.S. at 167; see also Howlett, 512 U.S. at 98. Third, under the
"duty to intervene," the shipowner has a duty only if "contract
provision, positive law, or custom" dictates "by way of supervision
or inspection [that the shipowner] exercise reasonable care to
discover dangerous conditions that develop within the confines of
the cargo operations that are assigned to the stevedore." Scindia
Steam, 451 U.S. at 172 (holding that when no contract, positive
law, or custom was alleged, shipowner was not responsible for
dangerous condition arising during cargo loading operations); see
also Howlett, 512 U.S. at 98.
 Regarding the turnover duty, England concedes that a breach of
this duty was not a possible basis for the jury's verdict. For ease
of discussion, we turn now to the duty primarily in dispute,
Reinauer's custom-generated duty to intervene, and we conclude with
a brief discussion of Reinauer's active control duty. We note that
Reinauer does not allege that the evidence was insufficient to
support findings that the elements of negligence, other than the
duty, were established.
 Regarding Reinauer's duty to intervene, England presented
evidence that a custom existed in the Port of Boston, encompassing
the Charlestown Moran Terminal, that the tug crew not only
initially moored the barge to the pier, possibly with the help of
line handlers hired by the barge company, but also inspected and
adjusted the mooring lines before cargo loading operations began as
well as during breaks in the longshoremen's work. Mooring lines
require periodic checking to ensure that they do not become
exceedingly tight or slack due to the competing forces on them,
such as alterations and shifts in the weight on the barge or 
movements of the tide. It was generally agreed that the need for
safety on the pier and barge was at its peak while the longshoremen
were working and that the adjustment of lines during active cargo
loading could be unsafe. 
 A "custom" can be defined generally as a "habitual practice or
course of action that characteristically is repeated in like
circumstances." Black's Law Dictionary 385 (6th ed. 1990). 
Testimony at the trial regarding the alleged custom was provided by
several witnesses. First, England testified that during his
sixteen years as a longshoreman in Boston, he had not received
training in the handling of mooring lines. England maintained that
he had never been relied upon to attach, tighten, or slacken lines
and that the responsibility had always been assigned exclusively to
the tugboat crew and the barge agent. He commented that on the
date of the accident he had not made any particular note of the
lines and, indeed, he did not have the skill to observe whether a
line was too tight or too slack. England stated that on occasion
he had been informed by the crane operator that the lines were
slack and the barge was pulling away from the pier, and that upon
the relay of that information to the tug crew, the crew would
tighten the lines.
 Second, George Sargent, a ship supervisor employed by
Massachusetts Port Authority to work at the Moran Terminal,
testified that it was a custom and practice in the Port of Boston
at the time of England's injury for "the tending of lines [to be
done] by the ship, the tugboats, or, in certain cases, the [barge]
agents" and that longshoremen did not have responsibility for
tending lines. Third, Matthew Crimson, barge operations manager
for Hale, agreed that it was consistent with his experience in the
Port of Boston that the tug crew maintained mooring lines.
 Fourth and most telling, Frederick Weber, captain of the tug,
stated that on his "few dozen" trips into the Moran Terminal towing
unmanned barges, the tug crew would secure the barge to the pier
upon arrival, inspect the lines before the cargo operations began,
and recheck the lines while the longshoremen were on break. Captain
Weber testified that by "inspecting" the mooring lines, he meant
that the tug crew "would walk over and check on them to make sure
that they are not too tight, that the barge is up against the dock,
secure in place, and it's safe for people to come back and forth." 
 Although Captain Weber insisted that the tug crew was not
"required" to inspect the lines, he conceded that they did so
customarily as a matter of good seamanship. He also noted that he
had been requested to adjust the lines in the past by a
longshoreman or barge agent. Captain Weber stated that on the day
of England's injury the tug crew checked the mooring lines at
approximately 8:00 a.m., just before the longshoremen began work,
and that, although they did not undertake a formal check during
the longshoremen's 10:00 break, when he left the tug at
approximately 10:30 to make a phone call in the terminal, he was
able to view the lines along the barge and determine that
"everything looked fine."
 On appeal, Reinauer contends first that the custom alleged by
England did not exist and second that even if a custom existed,
custom alone is insufficient to establish a duty. We reject
outright Reinauer's first argument that there was insufficient
evidence to support a finding of custom. Although Reinauer
argues that it had no duty to continuously monitor the condition of
the mooring lines and make adjustments as cargo operations were
occurring, an abundance of evidence lent itself to a finding that
it was a custom in the Port of Boston for the tug crew to inspect
and adjust the mooring lines before the cargo loading operations
began and during breaks in the work. Not only was there ample
evidence of such a custom, but the most conclusive testimony came
from Reinauer's own Captain Weber. 
 In support of its second argument, Reinauer relies on Florida
Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330 (5th Cir. 1993). 
In that case, a vessel crew member drowned after falling from a
ladder providing access from the dock to the vessel and his family
filed a maritime tort action against the vessel owner as well as
the dock owner. See id. at 331. The Fifth Circuit held, without
citation, that although "custom itself does not create [a] duty,"
it might be relevant to the standard of care once a duty has been
found to exist. See id. at 334. That case, however, was not
brought under the LHWCA, because it did not involve a
longshoreman's claim, and therefore the Scindia Steam outline of a
shipowner's duties to longshoremen was not applicable.
 The plain language of Scindia Steam clearly suggests that
custom alone is sufficient to create a duty owed by a vessel to a
longshoreman. Although in few cases has custom alone been alleged
to establish a duty, other courts have noted that the Scindia Steam
decision indicates that, if a custom did exist, it would establish
a duty. See, e.g., Keller v. United States, 38 F.3d 16, 32 (1st
Cir. 1994) (stating that "post-'turnover' duty may arise if the
vessel owner was obligated, by contract, statute or custom, to
monitor stevedoring operations for the purpose of detecting and
remedying unsafe conditions"); Kirsch v. Plovidba, 971 F.2d 1026,
1031 (3rd Cir. 1992) (reciting Scindia Steam language); Spence v.
Mariehamns R/S, 766 F.2d 1504, 1507-08 (11th Cir. 1985) (considering
whether evidence of custom sufficient); Sarauw v. Oceanic
Navigation Corp., 655 F.2d 526, 529 (3rd Cir. 1981) (Adams, J.,
concurring) (suggesting that custom of "good seamanship" could
create duty). Further, the limited scope of the custom established
in this case that the vessel crew has responsibility for
inspecting and adjusting mooring lines before cargo operations and
during breaks in the loading only in the Port of Boston does not
in any way contravene the overarching principle enunciated in
Scindia Steam that vessel owners are not responsible for generally
overseeing cargo operations.
 Moreover, regardless of whether Reinauer owed England a
custom-generated duty to intervene, the jury would have been
warranted in finding that Reinauer owed England an active control
duty. The active control duty "recognizes that although a vessel
owner no longer retains the primary responsibility for safety in a
work area turned over to an independent contractor, no such cession
results as relates to areas or equipment over which the vessel's
crew retains operational control." Manuel v. Cameron Offshore
Boats, 103 F.3d 31, 34 (5th Cir. 1997). 
 Reinauer argues that it did not have active control over the
area where the mooring line parted on the day of the accident and
completely ignores that strand of the active control duty that
extends to equipment over which the vessel retains control. See
Scindia Steam, 451 U.S. at 167 (stating that the vessel owner may
be liable "if it fails to exercise due care to avoid exposing
longshoremen to harm from hazards they may encounter in areas, or
from equipment, under the active control of the vessel"); see also
Torres v. Johnson Lines, 932 F.2d 748, 750 (9th Cir. 1991)
(considering whether vessel had exerted active control over loading
ramps). England contends that the mooring lines were within the
exclusive control of the tug crew and barge agent as evidenced by
the tug crew's morning inspection of the lines on the day of the
accident, Captain Weber's mid-morning check of the lines, the
vessel crew's admitted practice of reviewing the lines at certain
intervals, and the longshoremen's lack of knowledge about the
tending of mooring lines. The evidence presented by England was
ample to allow the jury to find that Reinauer retained operational
control over the mooring lines and thus had an active control duty
to inspect and adjust them. 
 B. Exclusion of Evidence of England's Collateral Source
Benefits
 Reinauer also argues that the court's exclusion of evidence
that England received collateral source income and medical benefits
under the LHWCA was an error that requires it be granted a new
trial. Reinauer contends that the evidence should have been
admitted because it was relevant to England's credibility as well
as his motive for not returning to work. Reinauer alleges that
England opened the door to this evidence by testifying that he
returned to work for a trial period after the accident "to be
productive and make some money to pay some bills" and that a non-
union job would provide insufficient income.
 The substantive aspect of the collateral source rule in
Massachusetts provides that "compensation received from a third
party unrelated to a tortfeasor-defendant (the collateral source)
will not diminish an injured party's recovery from that
tortfeasor." Fitzgerald, P.P.A. v. Expressway Sewerage Constr.,
Inc., 177 F.3d 71, 73 (1st Cir. 1999) (citing Jones v. Wayland, 374
Mass. 249, 262, 373 N.E.2d 199, 207 (1978); Goldstein v. Gontarz,
364 Mass. 800, 809, 309 N.E.2d 196, 203 (1974)). When a case is
being heard in federal court, the evidentiary, as opposed to the
substantive, aspects of the collateral source rule are governed by
the Federal Rules of Evidence, particularly Rules 401, 402, and
403. See Fitzgerald, 177 F.3d at 74. Under the evidentiary
strand of the collateral source rule, "[e]vidence of collateral
benefits offered to show that an employee has already received
compensation for his injuries is generally inadmissible." Torres,
932 F.2d at 752. When such evidence is relevant to some other
contested issue, however, it may be admitted if it is not unfairly
prejudicial; the risk of unfair prejudice from the admission of
this type of evidence must be weighed carefully because "a jury,
informed, say, that a plaintiff has recourse to first party
insurance proceeds, may be unduly inclined to return either a
defendant's verdict or an artificially low damage award." 
Fitzgerald, 177 F.3d at 75.
 Reinauer relies on Fitzgerald, in which the court upheld the
admission of collateral source benefits evidence when the victim's
mother testified that the medical bills resulting from the victim's
accident had financially strained the family. See id. at 75-76. 
Reinauer also references Corsetti v. Stone Co., 483 N.E.2d 793
(Mass. 1985), in which the Massachusetts Supreme Judicial Court
upheld the introduction of evidence of collateral source benefits,
when the victim's motivation was a genuine issue at trial, to
contradict the victim's extensive testimony of the "lack of money"
that he experienced as a result of his injuries. See id. at 803-04.
 England's testimony in this case, however, was not sufficient
to imply that he was suffering such financial difficulties as to
negate impliedly the receipt of any additional benefits due to the
accident and thus did not open the door for the introduction of his
collateral source benefits. Moreover, the court noted, when
preventing Reinauer from inquiring into England's collateral source
benefits on cross-examination, that the jury was likely aware that
England was receiving workers' compensation benefits. Further,
England testified on direct examination that if he took a non-union
job he would be expelled from the union and would thus lose his
health benefits, implying that he continued to receive medical
benefits while unemployed. Thus, the district court could
reasonably have concluded that the evidence of England's collateral
source benefits, even if relevant to his credibility or his motive
for not returning to work, would have been cumulative as well as
unfairly prejudicial to England and did not abuse its discretion in
excluding it.
 C. Disclosure of the Hale-England Settlement Agreement
 Finally, Reinauer contends that the court's denial of its
post-judgment motion for disclosure of the terms of the settlement
agreement between Hale and England was error because the agreement
was a "Mary Carter" agreement and thus unfairly prejudicial to
Reinauer. A "Mary Carter" agreement, occurring in multi-party
litigation, derives its name from Booth v. Mary Carter Paint Co.,
202 So. 2d 8 (Fla. Dist. Ct. App. 1967), and, although it has been
characterized many ways, can be summarized as an agreement in
which:
 (1) the liability of the settling defendant is limited
 and the plaintiff is guaranteed a minimum recovery; (2)
 the settling defendant remains a party to the pending
 action without disclosing the full agreement to the
 nonsettling defendants and/or the judge and jury; and (3)
 if judgment against the nonsettling defendant is for more
 than the amount of settlement, any money collected will
 first offset the settlement so that the settling
 defendant may ultimately pay nothing.

Banovz v. Rantanen, 649 N.E.2d 977, 980 (Ill. App. Ct. 1995). 
"Mary Carter" agreements have been widely criticized as unfair and
against public policy. See, e.g., John E. Benedict, Note, "It's a
Mistake to Tolerate the Mary Carter Agreement," 87 Colum. L. Rev.
338 (1987) (contending that "Mary Carter" agreements prejudice
nonsettling defendants, destroy equitable contribution of
defendants, and contradict legal ethics).
 The Hale-England agreement fails in several essential respects
to be a "Mary Carter" agreement. First, it was not kept secret;
all parties as well as the court were apprised at various points in
the trial of the ongoing negotiations between Hale and England. 
For example, on October 5, the second day of trial, England's
counsel informed the court and all parties, in chambers, that
England had reached a tentative settlement with Hale, but that its
finalization was dependent on the court's ruling on Hale's motion
in limine to exclude from evidence a contract between Hale and
Reinauer. Second, because it was endorsed on October 13, after the
case had been submitted to the jury, the settlement cannot be
guilty of altering the parties' behavior during trial. Third,
England represents that the agreement established a settled sum,
not contingent on the jury's verdict. For all of these reasons,
the agreement did not subversively motivate Hale and England to
join in undermining Reinauer's defense; the adversarial nature of
the relationship between Hale and Reinauer was already established
by their roles as co-defendants and their cross-claims for
indemnification and contribution.
 Given that the Hale-England agreement does not fall into the
"Mary Carter" category, the issue reveals itself to be the simpler
question of whether the court abused its considerable discretion by
refusing to force Hale and England to disclose the terms of its
post-trial agreement to Reinauer, the court, and the jury. As we
have already explained, the timing of the settlement was such that
it did not alter the relationships between the parties and thus
disclosure of its terms to Reinauer or the court was unnecessary. 
Moreover, it is doubtful that the court would have informed the
jurors of the terms of the settlement since they had already
entered deliberations requiring them to specify the degree of fault
of each party. For these reasons, we hold that the court did not
err by denying Reinauer's disclosure request. 
 Because we find no error in the court's post-trial rulings, we
affirm its judgment.
 Affirmed.