**Eliud A. TORRES, Plaintiff–Appellant,**

v.

**JOHNSON LINES; N.Y.K. Lines,
Defendants–Appellees.**

No. 89–55340.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1990.

Memorandum March 4, 1991.

Order and Opinion May 3, 1991.

Douglas M. Marshall, Newport Beach, Cal., for plaintiff-appellant.

Dawn M. Schock, Keesal, Young & Logan, Long Beach, Cal., for defendants-appellees.

Before GOODWIN, FARRIS and BOOCHEVER, Circuit Judges.

## ORDER

The memorandum disposition filed March 4, 1991, is redesignated as an authored opinion by Judge Goodwin.

## OPINION

GOODWIN, Circuit Judge:

Eliud Torres, a longshoreman, appeals the judgment on a defense verdict and the denial of his motion for a new trial in his negligence action against N.Y.K. Lines, the time charterer of the vessel on which he was injured. We affirm.

## I. NEGLIGENCE

On April 12, 1985, Pasha Maritime Services ("Pasha") was the stevedore in charge of offloading Mitsubishi pickup trucks from a vessel named the "Rosa Blanca." Torres, a Pasha employee, sustained injuries when he drove one of the trucks off the end of a raised ramp cover and fell some 15 feet to a lower deck. Vessel personnel at the stevedore's direction had raised the ramp cover from Torres' "Deck 3" in order to access the deck immediately above. Only after the ramp cover was raised did the stevedore superintendent James Lucas instruct his supervisor employees to warn the longshoremen not to drive on it. Torres never received that warning. Moments before the accident, however, a longshoreman driving a pickup truck behind Torres' truck noticed that the ramp was rising and honked for him to stop.

Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) gives an injured longshoreman a cause of action against a "vessel" for its negligence. 33 U.S.C. § 905(b). "Vessel" is defined to include the ship's "owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). As a time charterer, N.Y.K. is properly included in the "owner" category. *See Woods v. Sammisa Co.*, 873 F.2d 842, 846 n. 3 (5th Cir.1989); *Haluapo v. Akashi Kaiun, K.K.*, 748 F.2d 1363, 1364 (9th Cir. 1984).

*Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), delineates the respective duties a vessel owner and stevedore

owe a longshoreman under § 5(b). Although "the primary responsibility for the safety of the longshoremen rests upon the stevedore," *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir.1990), the vessel "owes to the stevedore and his longshoremen employees the duty of exercising due care 'under the circumstances.' " *Scindia*, 451 U.S. at 166, 101 S.Ct. at 1621 (citation omitted).

The *Scindia* duty of due care has six aspects: the turnover duty of safe condition, the turnover duty to warn of nonobvious hazardous conditions, the duty of due care in active involvement, the duty of active control, the duty to intervene and correct, and finally—if imposed by contract, positive law, or custom—the duty to supervise and inspect. We find no basis for reversal under *Scindia* in the present case.

First, the jury heard unrefuted evidence that the ship boss, a Pasha employee, had inspected the ship prior to the start of the off-loading operation and noticed nothing unsafe about the vessel. For that reason, Torres does not argue that N.Y.K. turned over an unsafe ship. Instead, he argues that the ship had a duty to warn him of the potential dangers of the ramp cover operation. Specifically, he claims that N.Y.K. had a duty to advise Pasha that roping off or barricading the ramp cover before raising it was necessary to ensure the safety of longshoremen like himself who were unfamiliar with the unique operation of the Rosa Blanca's ramp covers.

■ The evidence showed that N.Y.K. personnel explained to Pasha's supervisors the operation of the Rosa Blanca's ramp covers and necessary safety measures. N.Y.K.'s representative Captain Mitani testified that prior to unloading he instructed stevedore superintendent Lucas on the layout of the vessel, using photographs and blueprints that showed the ramp cover in both an open and closed position. Further, Captain Mitani said he suggested that the safest plan would be to discharge Deck 3 completely before raising the ramp cover to access Deck 2. The jury thus had sufficient evidence to conclude that the potential hazard posed by the ramp cover opera-

tion did not constitute a hidden danger, but constituted an obvious danger of which the stevedores were, or should have been, aware. *See Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207–08 (9th Cir.1989); *Woods*, 873 F.2d at 847. In any event, the jury reasonably could have concluded that N.Y.K. discharged its duty to warn Pasha by explaining the potential hazard to Torres' supervisor.

■ Under the third *Scindia* duty, a vessel is held to a standard of due care whenever it actively involves itself in cargo operations. *Bjaranson*, 873 F.2d at 1207. When vessel personnel raised the ramp cover, the ship became actively involved. Torres argues that vessel personnel should have supplied stanchions or other barriers at the entry to the raised ramp cover. A jury could reasonably have decided, however, that whatever the industry custom might have been, the testimony of stevedore boss Robert Coffey proved that an employee of the stevedore was responsible for barricading the ramp cover.

■ N.Y.K. had a duty to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under [its] active control ... during the stevedoring operation." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622; *Taylor v. Moram Agencies*, 739 F.2d 1384, 1387 (9th Cir.1984). The jury reasonably could have found that N.Y.K. did not breach its duty of active control. The only active control exercised by the ship was to raise and lower ramps when directed by the stevedore to do so.

■ A vessel has a duty to intervene and take reasonable steps to eliminate or correct any dangerous conditions. This duty arises only if the vessel knows or should know of the condition, realizes or should realize the condition presents an unreasonable risk of harm, and knows or should know that the stevedore, as a result of an obviously improvident judgment, has failed to remedy the situation. *Scindia*, 451 U.S. at 175–76, 101 S.Ct. at 1626–27; *Martinez v. Korea Shipping Corp.*, 903 F.2d 606, 608 (9th Cir.1990); *Bjaranson*, 873 F.2d at 1207. Our circuit has imposed an addition-

al requirement for establishing the duty: the vessel must have helped create the hazard. *See Bandeen v. United Carriers (Panama), Inc.,* 712 F.2d 1336 (9th Cir. 1983). In the present case, a jury could reasonably have concluded that the vessel personnel did not help to create the hazard because they raised the ramp cover at the direction of the stevedore supervisor.

Generally, a vessel does not have a duty to supervise and inspect in order "to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore," unless so imposed by contract, positive law, or custom. *Scindia,* 451 U.S. at 172, 176 n. 23, 101 S.Ct. at 1624, 1626 n. 23; *see also Lieggi v. Maritime Co. of the Philippines,* 667 F.2d 324, 327 (2nd Cir.1981).

■ Apparently, Clause 39 of the charter agreement between Johnson Lines, the vessel's owner, and N.Y.K. imposed on N.Y.K. a duty to supervise on- and off-loading operations. That provision also gave N.Y.K. a duty to have lifts and ramps operated by "qualified men" from the vessel. Torres concedes that Clause 39 did not place exclusive supervisory responsibilities on N.Y.K. He claims that "N.Y.K. retained at least concurrent control over the offloading operations and was therefore liable for [his] injuries."

The jury reasonably could have found that N.Y.K. did not breach its contractual duty to supervise the off-loading operation by failing to discover and eliminate the hazard created by the raised ramp. A shipowner's contractual duty to discover and eliminate hazards does not, absent specific language to the contrary, entail returning the vessel to perfect safety. *Cf. Martinez,* 903 F.2d at 610 (holding shipowner does not have a duty to turn the vessel over in "perfectly safe" condition). Rather, N.Y.K. had a duty to exercise ordinary care to return "the ship and its equipment in such condition *that an expert and experienced stevedore* [would] be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety...." *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622 (emphasis added). "[C]ertain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." *Bjaranson,* 873 F.2d at 1208. There was thus no duty to make the ship free from dangers an expert and experienced stevedore "should reasonably [have expected] to encounter." *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 416 n. 18, 89 S.Ct. 1144, 1151 n. 18, 22 L.Ed.2d 371 (1969).

Although the ramp operation in this case appears to have been unique to the Rosa Blanca, Captain Mitani had expressly warned stevedoring superintendent Lucas of the dangers inherent in the ramp operation. For that reason, Torres and his superiors could reasonably have been expected to anticipate the accident. As Torres' direct supervisor, Lucas had a duty at that point to relay the warning to the longshoremen. Because it was reasonable for N.Y.K. to expect that the message would be relayed, and because N.Y.K. had no indication that it had not been relayed, N.Y.K.'s liability does not turn on Lucas' failure to do so.

We reject Torres' contention that the defense verdict was not supported by evidence.

## II. EXPERT WITNESSES

■ Torres complains that the exclusion of his expert testimony was reversible error. He failed, however, to produce before this court a record of trial court error.

Expert testimony is appropriate in only a limited number of cases: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *F.R.E. 702.*

First, Torres failed to indicate, and the trial transcript does not reveal, any specific evidence that was so technical or complex that a jury could not have grasped it without the aid of experts. Second, Torres has supplied no record of an offer of proof as to how an expert would have shed light on the reasonableness of the ship's actions. The jury was capable of using common sense to evaluate, without the help of experts, whether the accident was caused by the negligence of the stevedore, or of the ship, or of Torres.

The trial court did not abuse its discretion by excluding Torres' expert testimony on the offer presented.

## III   COLLATERAL SOURCE BENEFITS

 At trial, ship boss Coffey testified that his employer Pasha had threatened to fire him unless he testified in favor of Torres' claim against N.Y.K. Torres called Daniel d'Agrosa, a vice-president at Pasha, to rebut Coffey's testimony. On cross-examination, d'Agrosa admitted that Pasha stood to benefit from a judgment against N.Y.K. because damages paid to Torres would go to Pasha as recompense. The implication of d'Agrosa's remark was, of course, that Pasha had been paying Torres worker's compensation benefits. Torres failed to make a timely objection to d'Agrosa's testimony. He did, however, request and receive an instruction cautioning the jury not to be influenced by d'Agrosa's statement. He complains, nevertheless, that admission of d'Agrosa's statement constitutes reversible error. The testimony was peripheral to the credibility of Coffey's testimony, but for a limited purpose it could have been received to show bias.

Evidence of collateral benefits offered to show that an employee has already received compensation for his injuries is generally inadmissible. *See Sheehy v. Southern Pacific Transportation Co.*, 631 F.2d 649, 651–52 (9th Cir.1980); *Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 369–70 n. 6 (5th Cir.1982). Federal Rule of Evidence 103(a)(1) requires, however, that a timely objection or motion to strike appear of record, stating the specific ground for the objection. Strictly construed, Rule 103(a)(1) compels the conclusion that Torres' failure to comply with that rule constitutes a waiver of his right, if any, to have d'Agrosa's statement excluded. *See Welch v. Dearborn Mach. Movers Co.*, 276 F.2d 192, 193 (6th Cir.1960); *Boettger v. Babcock & Wilcox Co.*, 253 F.2d 854, 859 (3rd Cir.1958).

 At any rate, Torres cannot complain that admission of d'Agrosa's testimony was unduly prejudicial. In the proper case, an appropriate instruction cures the erroneous admission of evidence of collateral benefits. *See Tipton v. Socony Mobil Oil Co.*, 375

U.S. 34, 35–36, 84 S.Ct. 1, 2–3, 11 L.Ed.2d 4 (1963). Here, the trial judge instructed the jury that "neither the fact that payments have been made to the plaintiff under the Act, nor the amount of the payments, is to be considered by the jury in any way, in determining any issue as to fault or blame or liability of damage in this case." This instruction cured any prejudice to Torres resulting from admission of d'Agrosa's statement. *See Riddle v. Exxon Transp. Co.*, 563 F.2d 1103, 1108–09 (4th Cir.1977) (remarking that "[w]hether, under the circumstances of the particular case the error has been cured by a cautionary instruction is normally 'a matter for the proper exercise of the sound discretion of the trial court,' and 'only in the event of a manifest abuse of judicial discretion should the appellate court interfere,' with the exercise of that discretion.").

AFFIRMED.