**Kedward HAINES, Plaintiff,**

v.

**HONOLULU SHIPYARD, INC.; United States of America; John H. Dalton, Secretary of the Navy on behalf of the United States Navy, Defendants.**

**No. CIV. 99–00241 HG.**

United States District Court,
D. Hawai'i.

March 29, 2000.

tional capacity, age, education, and work experience." 20 C.F.R. § 404.1520(f).

G. Todd Withy, Jeffrey A. Keating, Honolulu, HI, for Plaintiff.

Robert G. Frame, Michael D. Formby, Alcantara Frame & Formby, Honolulu, HI, for Defendant Honolulu Ship Yard, Inc.

Warren A. Schneider, U.S. Department of Justice, Torts Branch, Civil Division, San Francisco, CA, for Defendants United States and John Dalton.

## ORDER GRANTING DEFENDANT HONOLULU SHIPYARD, INC.'S MOTION FOR SUMMARY JUDGMENT and GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

GILLMOR, District Judge.

Plaintiff Kedward Haines brings this action against Defendants Honolulu Shipyard, Inc., the United States of America, and John H. Dalton, Secretary of the Navy, alleging that Defendants' negligent actions led to an injury Plaintiff suffered while performing repair work on board the U.S.S. Niantic, a navy tugboat. Plaintiff has brought this action pursuant to the Public Vessels Act, 46 U.S.C.App. § 781 *et seq.*, and the Suits in Admiralty Act, 46 U.S.C.App. § 741 *et seq.* This Court has jurisdiction pursuant to those acts.

Plaintiff's action against Defendant Honolulu Shipyard, Inc. is based on a theory of general negligence. Plaintiff's action against the United States of America is based on the Longshoreman and Harbor Worker's Compensation Act, 33 U.S.C. § 901 *et seq.* Plaintiff argues that both defendants were negligent because they failed to ensure a safe ship design and because they failed to monitor Plaintiff while he performed repair work on the ship.

As set forth in this Order, with regard to each defendant, Plaintiff has failed to establish a genuine issue of material fact exists as to the issue of negligence. The Court, accordingly, GRANTS Defendant Honolulu Shipyard, Inc.'s Motion for Summary Judgment and GRANTS Defendant United States of America's Motion for Summary Judgment.

### PROCEDURAL HISTORY

On April 1, 1999, Plaintiff Kedward Haines filed a Complaint against Defendants Honolulu Shipyard, Inc. ("HSI"), the United States of America and John H. Dalton, the Secretary of the Navy (the "Government") (collectively, the three individual defendants are referred to as "Defendants"), alleging that he was injured due to Defendants' negligence. On July 2, 1999, the Government filed an Answer and also filed a Crossclaim against HSI. On July 2, 1999, HSI also filed an Answer. On July 8, 1999, HSI filed an Amended Answer to the Complaint, and filed a Crossclaim against the Government.

On January 10, 2000, the Government filed a Motion For Summary Judgment (the "Government's Motion"). On the same day, HSI filed its own Motion for Summary Judgment ("HSI's Motion"). On January 27, 2000, Plaintiff filed a Joint Response to the Government's and HSI's motions for summary judgment. HSI filed a reply memorandum on February 1, 2000. The Government filed a reply memorandum on February 3, 2000.

After careful consideration of the evidence, the parties' arguments, and the governing law, the Court GRANTS the Government's motion and GRANTS HSI's motion.

### STATEMENT OF FACTS

This action arises from an accident Plaintiff experienced while performing

maintenance and repair work on the U.S.S. Niantic, a Navy tugboat.

On the date of the alleged accident—April 3, 1997—Plaintiff was employed by Allstate Industrial and Marine Cleaning ("Allstate"), where he worked as a production superintendent. Allstate had subcontracted with HSI to provide certain tank and cleaning work on board the U.S.S. Niantic, which was located at the facility of the Honolulu Shipyard on Oahu.

The United States Navy turned over custody of the Niantic to HSI, and HSI accepted custody, on March 7, 1997, the date the Niantic arrived at HSI's facility in the Honolulu Shipyard. (Exh. F and I to January 10, 2000 Declaration of Warren A. Schneider ("Schneider Declaration").) After this date, the Navy crew departed the vessel, with the exception of one crewmember, Petty Officer Douglas Houston. (Declaration of Petty Officer Douglas Houston, January 27, 2000.) The United States Navy was not performing any repair work at the time of the accident. Petty Officer Houston had two basic tasks while on board the Niantic. First, he was to provide information or assistance to shipyard workers who requested it. Second, he was to observe the vessel's equipment during the repair process to ensure that the proper work was being performed. (Id.)

One of Plaintiff's tasks during the repair of the Niantic was to conduct a paint inspection and damage assessment of the forward peak ballast tank of the ship, before any other Allstate employees worked on that tank.[1] It was during this inspection that the accident occurred. Plaintiff alleges that the accident occurred as follows: Prior to entering the tank, Plaintiff noticed a ventilation hose inside the tank, which was circulating oxygen into and out of the tank. (Exh. 1 to Plaintiff's Joint Response, at 81.) Plaintiff then tested the oxygen level in the tank and found it to be safe. (Id.) Plaintiff descended into the tank and started his inspection.[2] After Plaintiff was in the tank for approximately 15 to 25 minutes, he noticed that the ventilation hose had been pulled out and oxygen was no longer being pumped into the tank. (Id. at 95, 103.) Plaintiff became concerned about the quality of the air without a ventilation hose, and also feared that someone would close the hatch to the tank, thereby locking him in. (Id.) As a result, Plaintiff attempted to exit the tank. (Id.) Plaintiff alleges that when he was near the hatch opening, he got dizzy and blacked out. This allegedly caused Plaintiff to fall 10 to 15 feet to the bottom of the tank. After the fall, Plaintiff lay on the floor of the tank, unconscious, for 20 to 30 minutes. (Id. at 103.)[3]

Following the accident, Plaintiff returned to Allstate's plant to tell his supervisor that he had been injured. Plaintiff relayed that he had fallen, but did not tell his supervisor anything regarding the ventilation system or the removal of an oxygen hose. (Exh. 19 to HSI's Motion.) Plaintiff's supervisor offered to send Plaintiff to the emergency room, but Plaintiff turned down the offer. (Exh. 5 to HSI's Motion.)

Pursuant to an Allstate policy, Plaintiff also filed a written report on the day of the accident. In the written statement, Plain-

---

1. The tank in which the alleged accident occurred has an oval opening measuring 2 feet by 3½ feet. The tank is 15 feet deep, and has a triangular shape due to the fact that the tank is in the forward portion of the ship. (Exh. 1 to Plaintiff's Joint Response, at 81, 90.) The tank does not contain a fixed ladder by which a person can enter or exit. Instead, the tank contains longitudinal frames that workers or crew members use to assist them in entering and exiting the tank. (Exh. 3 to Plaintiff's Joint Response, ¶ 11.)

2. Plaintiff was by himself; no Allstate employee accompanied him into the tank.

3. Defendants dispute this specific version of the facts and also assert that Plaintiff's deposition testimony conflicts at times with a written statement Plaintiff made to Allstate on the day of the accident—April 3, 1997. (HSI's Mtn. Summ. Judg. at 2–4.)

tiff stated that he blacked out and fell while climbing the wall inside the tank. (*Id.*) Plaintiff, however, did not mention anything regarding the ventilation system or the removal of the oxygen hose. (*Id.*)

After the alleged accident, Plaintiff took one week off from his job. After taking that time off, Plaintiff returned to his job, where he worked for an additional week. (Deposition of Kedward Haines, December 13, 1999, at 106–107; Plaintiff's Sep. and Conc. Stmt. of Facts in Opp. to Def. United States Mtn. Summ. Judg. at ¶ 16.)

Plaintiff alleges that he suffered serious injuries to his lower back, left leg, and left foot as a result of the fall. Plaintiff saw a number of doctors following the accident. Plaintiff was seen by a physician on May 5, 1997, at Kahuku Hospital Emergency Room. According to the admission records from that visit, Plaintiff reported that he had blacked out and fallen three weeks prior to the visit. Plaintiff also reported that one week prior he had been assaulted by an employee, which led to him falling and re-injuring his back. (Exh. J to Schneider declaration.)

During a one-year period following the accident, Plaintiff was seen by a physician at Kaiser hospital named Dr. Bernard Portner. (Exh. 25 to HSI's Motion.) During his visits with Dr. Portner, Plaintiff did not tell the doctor anything regarding the ventilation being shut off or the oxygen hose being taken out of the tank. (*Id.*) In order to determine why Plaintiff blacked out, Dr. Portner referred Plaintiff, on a one-time basis, to a specialist, Dr. Khiem M. Nguyen. Plaintiff relayed to Dr. Nguyen that, when in the tank, he felt light-headed and then blacked out and fell. Dr. Nguyen's report, however, contains no statement regarding a lack of ventilation or the oxygen hose being removed. (Exh. 26 to HSI's Motion.) Dr. Nguyen's report concludes that "[t]he syncope episode is most likely secondary to orthostatic hypo-tension[4] and dehydration .... He may also have had heat syncope .... his orthostatic changes are most likely secondary to dehydration." (*Id.*)

In addition to seeing various doctors, Plaintiff had an industrial hygienist named David Gerow examine the facts of the case and give his opinion as to why Plaintiff blacked out and fell. Gerow, in his declaration dated January 26, 2000, reiterates Plaintiff's version of the facts and concludes that the "heat stress caused by working in the confined space of the forward peak ballast tank, the removal of adequate ventilation ... the sudden stress and movement from trying to make an emergency exit, and the lack of a safe and easy egress route ... were the causative factors of the injury suffered by Mr. Haines." (Exh. 8 to Plaintiff's Joint Response.)

Plaintiff alleges that he has not worked since April 21, 1997 due to his injury. Plaintiff also alleges that he underwent back surgery due to the injury in June 1999, and that he is still undergoing physical therapy.

### STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party has the initial burden of "identifying for the court the portions of the materials on file [in the case] that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant

---

4. Syncope is defined as "fainting" and orthostatic hypotension is defined as "a fall in blood pressure associated with dizziness, syncope, and blurred vision occurring upon standing or when standing motionless in a fixed position." (Exh. 27 to HSI's Motion.)

probative evidence tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv.*, 809 F.2d at 630; Fed.R.Civ.P. 56(e). In a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319, 320 (9th Cir.1989).

### ANALYSIS

Plaintiff has sued the Defendants—the Government and Honolulu Shipyard, Inc.—based on a theory of negligence. Both Defendants have filed motions for summary judgment, arguing that Plaintiff cannot establish certain elements of the tort of negligence. The motions are addressed in turn.

I. *United States Government's Motion for Summary Judgment*

██ Both Plaintiff and the Government agree that Plaintiff is suing the Government pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*[5] Plaintiff and the Government also agree that under the LHWCA, Government liability is dependent on a finding of negligence. *See* 33 U.S.C. § 905(b); *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 101–102, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).

In order to establish negligence, it is well-settled that a plaintiff must establish four essential elements, as follows:

1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of con-

duct, for the protection of others against unreasonable risks[;]

2. A failure on the [defendant's] part to conform to the standard required; a breach of duty . . . [;]

3. A reasonably close causal connection between the conduct and the resulting injury . . . [and]

4. Actual loss or damage resulting to the interests of another. . . .

*Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 384–385, 742 P.2d 377 (Haw. 1987), *citing* W.P. Keeton, *Prosser and Keeton on the Law of Torts* § 30, at 164– 165 (5th ed.1984) (footnotes omitted) (further citation omitted). The Government argues in its motion that Plaintiff cannot establish the second element of negligence. Specifically, the Government contends that Plaintiff has not and cannot demonstrate that the Government breached any duty owed to Plaintiff.

██ The duties a ship owner (here, the Government) owes to a longshoreman or repair worker[6] under the LHWCA were originally established in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The duties have been further defined, and summarized, in a number of cases interpreting *Scindia*, including *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994), *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207–1208 (9th Cir. 1989), *Torres v. Johnson Lines*, 932 F.2d 748, 750 (9th Cir.1991); and *Taylor v. Moram Agencies*, 739 F.2d 1384 (9th Cir. 1984). According to *Scindia* and its progeny, a vessel owner's duty is divided into six categories. These duties are breached if and when a vessel owner:

1. Fails to turnover a reasonably safe vessel, equipment, and work space so a reasonably competent worker can safely

---

**5.** Plaintiff does not cite the LHWCA as a basis for the action in Plaintiff's Complaint. The Government and Plaintiff, however, agree in their briefs that government liability in this case must stem from the LHWCA.

**6.** *Cook v. Exxon Shipping Co.*, 762 F.2d 750, 752 (9th Cir.1985), provides that the duty of care applies not only to longshoremen but also to repair workers on a vessel.

perform his tasks (turnover duty of safe conditions);

2. Fails to warn the ship repair worker of non-obvious hazardous conditions (turnover duty to warn);

3. Actively involves itself in repair work and negligently injures a ship worker or repairman (active involvement duty);

4. Fails to exercise due care to avoid exposing ship workers to harm from hazards they may encounter in areas, or from equipment under the active control of the vessel during the work (active control duty);

5. Fails to intervene and correct a condition posing an unreasonable risk or harm when the vessel owner had actual knowledge of the danger and knows he cannot rely on the ship worker to correct the situation (duty to intervene); and

6. Fails to discover dangerous conditions that develop within the confines of the ship repairman's work if imposed by contract, positive law, or custom (duty to supervise and inspect).

See *Torres* 932 F.2d at 750–751; *Bjaranson*, 873 F.2d at 1207–1208.

Here, Plaintiff argues that the Government breached duties number one, two, four, and six. The Government, in response, argues that Plaintiff has failed to set forth any evidence demonstrating that the Government breached these duties. As set forth below, the Court agrees with the Government with respect to each of these four duties.

### 1. *Turnover Duty of Safe Conditions*

Plaintiff argues that the Government breached its turnover duty of safe condi-

tion by failing to have a more safe tank design and by failing to warn Plaintiff of the alleged design flaws of the tank.[7] Plaintiff's argument is not persuasive.

 The turnover duty of safe condition was described by the *Scindia* Court as follows:

> [The vessel must exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.

*Scindia*, 451 U.S. at 167, 101 S.Ct. 1614. This duty does not require that a vessel owner turn over the vessel in a perfectly safe condition. See *Bjaranson*, 873 F.2d at 1207–1208. This is so because *Scindia* states only that the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an "expert and experienced" worker or repair person. *Scindia*, 451 U.S. at 167, 101 S.Ct. 1614. This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced worker could safely work around them. See *Bjaranson*, 873 F.2d at 1208 (determining that the explicit references in *Scindia* and the cases cited by *Scindia* to dangers remaining aboard ship "indicates that a shipowner may leave unremedied conditions that would otherwise be considered unreasonably dangerous to less skilled persons.") In order to prove that this duty was breached, therefore, a plaintiff must introduce evidence that the hazard was "such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to

---

**7.** Both Plaintiff and the Government incorrectly merge together the first two duties—the turnover duty of safe conditions and the turnover duty to warn. The Government argues, specifically, that the turnover duty of safe conditions applies only to latent conditions, and cites *Howlett*, 512 U.S. at 99, 114 S.Ct. 2057, for the proposition. The Government

has misconstrued the language of *Howlett*. The prerequisite that a condition be latent applies only to the turnover duty to warn, and not to the turnover duty of safe conditions. See *id.* at 98–99, 114 S.Ct. 2057. Although the duty to warn is a corollary to the turnover duty, the duties are most properly analyzed independently. See *id.* at 98, 114 S.Ct. 2057.

persons and property.'" *Id.* (citing *Scindia*, 451 U.S. at 167, 101 S.Ct. 1614).

■ Here, Plaintiff has not satisfied this burden because he has failed to set forth evidence demonstrating that an experienced ship repair worker could not, with the exercise of reasonable care, enter, exit, and work inside of the tank. Rather than establishing negligence under this standard, the evidence in this case supports the conclusion that an expert and experienced worker could have safely entered and exited the tank, despite the alleged shortcomings in the tank design. Employees of HSI had entered the tank on at least one occasion prior to Plaintiff's accident. (Defendant United States of America's Sep. and Conc. Stmt. of Facts, ¶ 11.) In addition, Plaintiff himself had safely entered the tank on the day of the accident. (*Id.*, ¶ 12.) These facts suggest that the tank was indeed safe for experienced workers. Plaintiff has failed to set forth any evidence otherwise. Because Plaintiff has not put forth evidence showing that an expert worker could not, with the exercise of reasonable care, enter, exit, and work inside the tank, he has failed to establish the existence of a genuine issue of material fact as to whether the Government breached its turnover duty of safe conditions.

■ Plaintiff attempts to rely on regulations promulgated by the Occupational Safety and Health Administration ("OSHA") to establish that the Government breached this duty.[8] Plaintiff's reliance on these regulations is unpersuasive, for three reasons. First, the OSHA regulations cited by Plaintiff are applicable only to Plaintiff's employer, Allstate, and not to the Government. *See* 33 U.S.C. § 941; *Farr v. NC Machinery Co.*, 186 F.3d 1165, 1171 (9th Cir.1999), *cert. denied*, 528 U.S. 1117, 120 S.Ct. 938, 145 L.Ed.2d 816 (2000). Second, caselaw, as discussed above, has defined the turnover duty of safe conditions and set forth its

parameters. *See, e.g., Bjaranson*, 873 F.2d at 1207. Although OSHA regulations may set forth various safety requirements, they neither define nor discuss what designs or conditions are safe or unsafe for a *skilled worker* exercising reasonable care. The regulations therefore shed little light on whether the turnover duty of safe conditions was breached here. Third, even if, as Plaintiff argues, OSHA regulations serve as evidence of an "industry standard", Plaintiff has not set forth any evidence to define the relevant industry. It seems more likely that the regulations regarding the design of a vessel would apply to an industry of builders of vessels or repairers of vessels than an industry of owners, such as the Government in this case. *See, e.g.,* 29 C.F.R. § 1915.94 ("The provisions of this section shall apply to ship repairing, shipbuilding, and shipbreaking.") The OSHA regulations cited by Plaintiff do not establish a genuine issue of material fact as to the issue of whether the Government breached the turnover duty of safe conditions.

### 2. *Turnover Duty to Warn*

Plaintiff contends that the Government breached its duty to warn Plaintiff about unsafe design conditions inside the tank. The Government contends that it could not have breached this duty because the duty applies only to latent hazards. The Government's argument has merit.

■ A vessel owner has a duty to warn of hazardous conditions on the ship that are known or should have been known to it but are not obvious to the contractor or its personnel. *See Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057. This duty, however, applies only to latent hazards. As stated by the *Howlett* Court, the duty arises only when there are hazards that "are not known by the [repair worker], and would not be *obvious* to or anticipated by him if

---

8. Plaintiff actually relies both on OSHA regulations and the Declaration of David Gerow. Gerow's conclusion that the tank design was unsafe, however, is based solely on OSHA regulations. (Declaration of David Gerow, January 26, 2000, ¶ 6.)

reasonably competent in the performance of his work." *Id.* (emphasis added).

■ Here, the evidence presented makes it clear that the allegedly dangerous structural conditions of the tank were obvious to Plaintiff. Plaintiff, a self-described production superintendent, had experience repairing and supervising the repair of vessels. (Defendant HSI's Sep. and Conc. Stmt. of Facts, ¶ 1.) Before entering the tank, Plaintiff conducted a test to determine the oxygen level in the tank. (*Id.,* ¶ 7.) After performing the test and determining that the oxygen level was safe, Plaintiff observed the tank and then descended into it. (Defendant United States' Sep. and Conc. Stmt. of Facts, ¶ 12.) Plaintiff worked inside the tank for approximately 15–25 minutes before he attempted to ascend out of the tank. (Exh. 1 to Plaintiff's Joint Response, at 95, 103.) These facts suggest that Plaintiff was able to see the conditions and structural design of the tank in which he worked. In addition, Plaintiff's ability to describe in detail the structural conditions in the tank (Plaintiff's Sep. and Conc. Stmt. of Facts in Opp. to Def. HSI's Motion, ¶ 32) demonstrates that the conditions were open and obvious to Plaintiff. Plaintiff has failed to present any evidence demonstrating otherwise.

Because the evidence demonstrates that the structural conditions in the tank were open and obvious to Plaintiff, Plaintiff has failed to establish the existence of a genuine issue of material fact as to this issue. *See Howlett,* 512 U.S. at 98–99, 114 S.Ct. 2057.

### 3. *Active Control Duty*

■ Plaintiff argues that the Government breached the active control duty because the Government maintained active control of the Niantic yet did not monitor Mr. Haines while he was performing repair work in the tank. The Court disagrees.

Plaintiff's premise regarding this duty is that the Government maintained "active control" of the vessel while Plaintiff was performing repair work because the Government positioned one petty officer on board the Niantic during the repair period. Plaintiff has provided no cite to support its contention that one officer on board equates to active control of vessel.

Evidence submitted by the Government demonstrates that it did not have active control. Specifically, the Government has presented a Craft Custody Form, which shows that the contractor—HSI—assumed custody of the Niantic on March 7, 1997. (Exh. F to Schneider declaration.) Plaintiff has submitted no evidence to counter this document. In addition, Petty Officer Houston, the one officer who remained on board the Niantic during repairs, has stated that his duties on the Niantic were limited. In particular, Petty Officer Houston was stationed on the vessel solely to provide information and assistance to workers, and to observe that work was being done properly. (Declaration of Douglas Houston, January 27, 2000.) The fact that there is documentation to show that HSI had custody and that Petty Officer Houston had very limited duties demonstrates that the Government did not have active control over the Niantic. *See Bjaranson,* 873 F.2d at 1209; *Scindia,* 451 U.S. at 167, 101 S.Ct. 1614 (stating that a vessel may be liable "if it actively involves itself in the cargo operations and negligently injures a longshoreman.") Plaintiff has failed to set forth evidence countering the Government's evidence, and has therefore failed to establish the existence of a genuine issue of material fact on this issue.

### 4. *Duty to Supervise and Inspect*

Plaintiff argues that the Government breached the duty to supervise and inspect because the Government failed to have an officer or employee monitor Plaintiff while he was working in the tank. Plaintiff's argument is not persuasive.

Generally, a vessel does not have a duty to supervise and inspect in order to discover dangerous conditions. *See Torres*, 932 F.2d at 751. The duty arises only when imposed by contract, positive law, or custom. *Id.* Here, Plaintiff does not allege the existence of any contract or positive law. Instead, Plaintiff contends that industry custom established the duty. Specifically, Plaintiff argues that OSHA regulations establish an industry custom that imposed an obligation on the Government to supervise and inspect the Niantic, and to monitor the repair work that was being performed.[9] Plaintiff's argument here fails for similar reasons to those set forth above with regard to the turnover duty of safe conditions.

As set forth above, the OSHA regulations are applicable to Plaintiff's employer, but not to the Government. *See* 33 U.S.C. § 941; *Farr*, 186 F.3d at 1171. Also, Plaintiff has failed to set forth any evidence to define the relevant industry. The OSHA regulations cited by Plaintiff suggest that the pertinent industry is shipbuilders and repairers, not ship owners. *See* 29 C.F.R. § 1915.94 ("The provisions of this section shall apply to ship repairing, shipbuilding, and shipbreaking.")

Plaintiff points out that despite the case of *Farr*, OSHA regulations may be used to establish industry custom.[10] Plaintiff cites two cases for this proposition—*Darwin v. United States*, 435 F.Supp. 501, 508 (N.D.Cal.1977), and *Gallardo v. Westfal–*

*Larsen & Co.*, 435 F.Supp. 484 (N.D.Cal. 1977). Although both cases do in fact state that OSHA regulations are admissible as evidence of safety standards in general negligence actions, the *Darwin* court noted that, "the regulations may be of limited evidentiary value ...." *Darwin*, 435 F.Supp. at 508 n. 12. Here, Plaintiff's mere cite to 29 C.F.R. § 1915.94, without more, is inadequate to establish the existence of an industry custom, applicable to the industry of shipowners, that requires owners to supervise and inspect a ship and to monitor repair work being done on that ship.

Because Plaintiff has failed to demonstrate the existence of any contract, positive law, or industry custom that imposes a duty on shipowners to supervise and inspect dangerous conditions on the ship, or to monitor repair work on the ship, he has not established a genuine issue of material fact on this issue.

Plaintiff has failed to set forth sufficient evidence to establish that the Government breached any of the four duties at issue in this action. Specifically, Plaintiff has not met his burden to show that the Government breached the turnover duty of safe conditions, the turnover duty to warn, the duty of active control, or the duty to supervise and inspect. Because Plaintiff has not established any breach, Plaintiff *a fortiori* cannot establish that the Government was negligent.[11] The Court, accordingly,

---

9. Plaintiff relies on two OSHA provisions—29 C.F.R. § 1915.11 and 29 C.F.R. § 1915.94 (Plaintiff's Joint Response at 10.) Plaintiff contends that both of these provisions establish safety regulations with regard to workers who conduct work in confined areas. Section 1915.11 is a definitions section. This section does not itself establish any safety regulations or requirements. Section 1915.94 states that when ship repair work is done in a confined place, frequent checks shall be made to ensure the safety of the employees.

10. *Farr*, according to Plaintiff, applies only to actions concerning the tort of negligence per se, not the tort of general negligence.

11. A further basis for granting the Government's motion is that Plaintiff does not dispute the fact that there is no evidence of any negligence by the Government, which in any way was a *causative or contributive factor* to Plaintiff's injuries. (Defendant United States' Sep. and Conc. Stmt. of Facts, ¶ 25; Plaintiff's Sep. and Conc. Stmt. of Facts in Opp. Government's Motion, ¶ 25.) Without any evidence of causation, Plaintiff cannot establish the Government's negligence. *See Knodle*, 69 Haw. at 384–385, 742 P.2d 377.

GRANTS the Government's Motion for Summary Judgment.

■ The Court's holding regarding the Government's Motion for Summary Judgment includes Defendant John H. Dalton, Secretary of the Navy. The Court determines, however, that there is an additional basis upon which to dismiss Plaintiff's action as to Defendant Dalton. Plaintiff notes in his Complaint that this action is brought against the United States pursuant to the Public Vessels Act, 46 U.S.C.App. §§ 781–790. That statute, at section 782, incorporates consistent provisions of the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752. One of those consistent provisions, 46 U.S.C.App. § 745, states that the remedy provided against the United States is exclusive of any remedy against any employee of the United States. *See* 46 U.S.C.App. § 745. This statute serves as further support for the Court's determination that Plaintiff's action should be dismissed as to Defendant Dalton.

II. *Honolulu Shipyard, Inc.'s Motion for Summary Judgment*

HSI moves for summary judgment based on the ground that Plaintiff cannot establish the third negligence requirement—causation. In particular, HSI argues that Plaintiff has failed to set forth any evidence that establishes a causal link between his blackout and any acts done by HSI.[12] HSI's argument has merit.

In order to establish the negligence of HSI, Plaintiff must establish that HSI caused Plaintiff's blackout. The causation element is described in *Mitchell v. Branch,* 45 Haw. 128, 131, 363 P.2d 969 (Haw.1961) as follows:

To impose liability on a negligent party for an injury to another, there must be a causal connection between the negligent act and the injury. The mere coexistence of negligence and injury or the existence of negligence prior to the injury is not in itself sufficient to establish this necessary causal relationship. The injury must be the result of, or flow from the negligent act before the negligent party is liable. (citations omitted)

Stated another way, "[t]he actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm...." *Knodle,* 69 Haw. at 390, 742 P.2d 377 (citing Restatement (Second) of Torts, § 431 (1965)). A party must set forth specific evidence to demonstrate causation, and cannot rely on mere speculation or conjecture to avoid summary judgment. *See id.; Marport, Inc. v. Stabbert & Assocs., Inc.,* 771 F.2d 1216, 1218 n. 3 (9th Cir.1985).

■ Here Plaintiff does not rely on his own testimony to establish causation. Instead, Plaintiff relies on a letter from one of his physicians, Dr. Khiem Nguyen, and the declaration of an expert, David Gerow. (Plaintiff's Joint Response, at 14–17.) Neither the letter from Dr. Nguyen nor the Gerow declaration serve as sufficient evidence to establish that HSI's conduct was a substantial factor in causing Plaintiff's blackout.

Doctor Nguyen, in a letter dated May 7, 1997, summarizes Plaintiff's allegations regarding his accident.[13] (Exh. 7 to Plaintiff's Joint Response.) After summarizing the incident, the letter lists Plaintiff's symptoms, which include "numbness and tingling on his right arm" and "occasional bitemporal pulsating headache." (*Id.*) Next, the letter lists the results of Dr.

---

12. Plaintiff's Joint Response addresses a number of other issues with respect to HSI, such as whether HSI owed and breached a duty to Plaintiff. The Court does not address these additional points, as HSI is only challenging the causation factor at this juncture. (HSI's Reply Memo. at 2.)

13. Although Dr. Nguyen's letter states that Plaintiff reported feeling lightheaded before his fall, it says nothing regarding a lack of ventilation or removal of an oxygen hose.

Nguyen's physical examination of Plaintiff. Last, the letter speculates as to why Plaintiff was experiencing physical problems. The letter states:

> The syncope episode is most likely secondary to orthostatic hypotension [14] and dehydration. Today, he does have some orthostatic changes although he is asymptomatic. He may also have had heat syncope. Thus, the contributing factors leading to his syncope include inadequate p.o. intake, heat and humidity, and strenuous activities. As indicated above, his orthostatic changes are most likely secondary to dehydration.

(*Id.*)

A reading of Dr. Nguyen's letter makes it clear that the doctor is, at most, merely speculating about what may have caused Plaintiff to black out. Dr. Nguyen never states any specific reason why Plaintiff blacked out. Instead, he merely lists some contributive factors and states that the episode was likely "secondary to orthostatic hypotension and dehydration" and that Plaintiff "may also have had heat syncope." These short descriptions alone do not demonstrate that any of HSI's actions or inactions caused Plaintiff's blackout. Dr. Nguyen's letter, one of Plaintiff's two bases for establishing causation, is not sufficient to establish the existence of a genuine issue of material fact as to the issue of causation. *See United States v. Wilson*, 881 F.2d 596, 601 (9th cir.1989) (finding that the "defendants' evidence was too speculative to withstand plaintiffs' motion for summary judgment."); *Marport*, 771 F.2d at 1218 n. 3 (holding that a party cannot rely on purported factual issues "or avoid summary judgment through sheer speculation.").

Plaintiff also relies on the declaration of David Gerow to establish causation. Gerow states that he is an expert in the field of industrial hygiene.[15] (Exh. 8 to Plaintiff's Joint Response.) Gerow's declaration is based on his review of Plaintiff's deposition, the parties' interrogatories, and other documents provided to him by Plaintiff. In the declaration, Gerow reiterates Plaintiff's allegations that a ventilation hose was being withdrawn and that, as a result, the temperature rose in the tank. (*Id.* at ¶ 5.) Gerow also discusses the design of the tank, and opines that the tank did not provide a safe means of access or egress for workers. In the last paragraph of his declaration, Gerow sums up the rest of his declaration and offers his opinion as to why Plaintiff blacked out. Gerow states:

> Based on a review of the available information, it is my opinion that heat stress caused by working in the confined space of the forward peak ballast tank, the removal of adequate ventilation in the space that would have made work in the tank cooler and less humid, the sudden stress and movement from trying to make an emergency exit, and the lack of a safe and easy egress route from the tank were the causative factors of the injury suffered by Mr. Haines.

(*Id.* at ¶ 8.)

Plaintiff contends that the Gerow declaration establishes that HSI's actions caused Plaintiff to black out. The Court disagrees. The Court determines that Plaintiff has not established that Gerow is qualified to testify as to what caused Plaintiff to black out and also that Gerow's testimony is too speculative to demonstrate what caused Plaintiff's blackout.

Under Federal Rule of Evidence 702, a trial judge must ensure that all expert testimony admitted is not only relevant, but reliable. Rule 702 "contemplates some degree of regulation of the subjects and

---

**14.** Syncope is defined as "fainting" and orthostatic hypotension is defined as "a fall in blood pressure associated with dizziness, syncope, and blurred vision occurring upon standing or when standing motionless in a fixed position." (Exh. 27 to HSI's Motion.)

**15.** HSI notes that Gerow was not present at the accident and that his declaration, which is dated January 26, 2000, was given over two and one-half years after the alleged incident.

theories about which an expert may testify." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Referring to Rule 702, the *Daubert* Court noted:

> "The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the work "knowledge" connotes more than subjective belief or unsupported speculation." [16]

*Id.* at 589–590, 113 S.Ct. 2786 (internal citation and footnote omitted).

In *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Court drew from *Daubert* and determined that an expert's testimony as to causation must be based on more than mere speculation. In *General Electric*, the plaintiff was diagnosed with small cell lung cancer in 1991. The plaintiff sued his employer, among others, alleging that his cancer was linked to his exposure to PCB's at his job. The plaintiff's experts opined that because the plaintiff had been exposed to PCB's on the job, such exposure was likely responsible for his cancer. The experts presented only limited evidence demonstrating a scientific basis for their testimony. The district court struck the experts' testimony, determining that it was nothing more than speculation. *Id.* at 516. The Supreme Court upheld the district court's decision. The *General Electric* Court, on the issue of the expert's testimony, stated:

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 519 (citations omitted).

In the instant case, Plaintiff has not set forth any evidence to demonstrate that Gerow's testimony regarding what caused Plaintiff to black out is reliable and not mere speculation. Gerow has stated that he is an expert in the field of industrial hygiene. Plaintiff has not shown how a background in that field qualifies Gerow to testify as to the physical cause of Plaintiff's blackout. Such a background may qualify Gerow to testify regarding the design of the tank and the safety conditions, or lack thereof, in the tank. It is not apparent to the Court, however, how this background qualifies Gerow to testify regarding the causation of the blackout or to give a diagnosis of Plaintiff's physical condition.

Neither Plaintiff nor Gerow, in addition, have set forth any scientific basis for Gerow's testimony, or any evidence to demonstrate the reliability of the testimony. Based on a review of the declaration, it appears to the Court that Gerow's statements and conclusions are mere assertions. Without some additional evidence regarding the method by which Gerow formed his conclusions, Plaintiff has not established the reliability of Gerow's statements regarding the cause of Plaintiff's black out. *See Kumho Tire*, 119 S.Ct. at 1174 (holding that all expert testimony must comply with the standard of reliability set forth in *Daubert*); *see also Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable.")

Plaintiff has not presented evidence to demonstrate how Gerow is qualified to testify about the physical cause of Plaintiff's blackout, or to demonstrate that Gerow's conclusions are reliable. The Gerow declaration, therefore, does not create a genuine issue of material fact as to the issue of causation.

---

16. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), extends *Daubert* to all expert testimony, regardless of whether it is "scientific."

Both the letter from Dr. Nguyen and the Gerow declaration speculate as to the cause of Plaintiff's blackout. Without more definitive or reliable evidence, Plaintiff has failed to establish a genuine issue of material fact as to the causation of the blackout. Without establishing causation, Plaintiff, *a fortiori*, cannot establish that HSI was negligent. The Court, accordingly, GRANTS HSI's Motion for Summary Judgment.

### III. *Discovery Issues*

Plaintiff argues that he should be allowed time for additional discovery, pursuant to Federal Rule of Civil Procedure Rule 56(f), before the Court rules on the instant motions for summary judgment. (Plaintiff's Joint Response at 18.) Specifically, Plaintiff contends that he requires additional time to depose witnesses and to obtain complete responses to the interrogatories he sent to Defendants. The Court is not persuaded by Plaintiff's argument. The Court determines that additional time for discovery under Rule 56(f) is not necessary.

The Ninth Circuit, in *Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades District Council*, 817 F.2d 1391, 1395 (9th Cir.1987), set forth the standard for granting a continuance pursuant to Rule 56(f). The *Continental Maritime* court stated:

> Fed.R.Civ.P. 56(f) allows, but does not require, a district court to grant a continuance when a party opposing summary judgment wishes to conduct further discovery. Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact. The mere hope that further evidence may develop prior to trial is an insufficient basis for a continuance under Fed. R.Civ.P. 56(f).

*Continental Maritime of San Francisco, Inc.*, 817 F.2d at 1395 (internal citations omitted). In order to meet its burden under Rule 56(f), the moving party must make clear what specific information is sought and how it would preclude summary judgment. *See Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir.1987). Here, Plaintiff has failed to meet this burden because he has neither set forth what specific additional information he is seeking nor explained how any additional information would possibly preclude summary judgment.

Plaintiff has also failed to conduct discovery in this action in a timely manner. This serves as additional grounds to deny Plaintiff's request. *See Frederick S. Wyle, P.C. v. Texaco, Inc.*, 764 F.2d 604, 612 (9th Cir.1985) (finding that a party had no basis to obtain additional time for discovery when it failed to pursue discovery diligently before summary judgment.) Plaintiff filed his Complaint in this action on April 1, 1999. At present—ten months later—Plaintiff has not taken one deposition. The first time Plaintiff tried to schedule a deposition in this case was after Defendants filed their motions for summary judgment. Moreover, the dates requested by Plaintiff were after the scheduled hearing on Defendants' motions. (Affidavit of Michael D. Formby, February 1, 2000, ¶¶ 4–5.) Plaintiff has had ample time during which he could have conducted the additional discovery he now requests.

For the foregoing reasons, the Court determines that time for additional discovery is unnecessary before the Court rules on the instant motions. The Court, accordingly, DENIES Plaintiff's request for additional discovery time.

### CONCLUSION

In accordance with the foregoing, it is HEREBY ORDERED:

1. The Court GRANTS Defendant Honolulu Shipyard Inc.'s Motion for Summary Judgment.

2. The Court GRANTS Defendant United States of America's Motion for Summary Judgment.

3. The Court DISMISSES WITH PREJUDICE the action as to Defendants Honolulu Shipyard Inc., United States of America, and John H. Dalton.

4. The Court DISMISSES AS MOOT Defendant United States of America's Cross–Claim Against Cross–Defendant, Honolulu Shipyard Inc.

5. The Court DISMISSES AS MOOT Defendant Honolulu Shipyard, Inc.'s Cross–Claim Against Defendant United States of America.

As no claims or parties remain, the action is DISMISSED with prejudice.

IT IS SO ORDERED.